## FOX *v.* STANDARD OIL COMPANY OF NEW JERSEY.

No. 69.   Argued November 9, 1934.—Decided January 14, 1935.

88

*Mr. Homer A. Holt,* Attorney General of West Virginia, with whom *Messrs. R. Dennis Steed* and *Wm. Holt Wooddell,* Assistant Attorneys General, were on the brief, for appellant.

*Mr. H. D. Rummel,* with whom *Messrs. Donald O. Blagg* and *A. G. Stone* were on the brief, for appellee.

90

Mr. Justice Cardozo delivered the opinion of the Court.

The controversy hinges upon the meaning and validity of the chain store license tax of West Virginia in its application to distributing plants and service stations for the sale of gasoline and kindred products.

On March 8, 1933, the legislature of West Virginia passed a law whereby all persons and corporations operating or maintaining a store as therein defined were required to obtain an annual license from the state tax commissioner. The license fee was graduated according to the number of stores. Upon one store the fee was to be $2; upon two stores or more, but not to exceed five, the fee was to be $5 for each additional store; upon six or more, but not to exceed ten, $10 for each additional store; upon each store in excess of ten, but not to exceed fifteen, $20; upon each in excess of fifteen, but not to exceed twenty, $30; upon each in excess of twenty, but not to exceed thirty, $35; upon each in excess of thirty, but not to exceed fifty, $100; upon each in excess of fifty, but not to exceed seventy-five, $200; and upon each in excess of seventy-five, $250.

Appellee, complainant in the court below, is a Delaware corporation, engaged in the business of refining, transporting and distributing petroleum products. It owns or controls in West Virginia 949 service or filling

stations, and 54 bulk plants, a total of 1003. Of the 949 stations, there are 101 which are described as " company owned "; these are both owned and operated by the complainant itself. " Leased outlets," 388 in number, and " vending privilege outlets," 460 in number, are leased by the complainant and operated by agents under commission contracts. By concession its control over these outlets is so complete as to amount to operation within the meaning of the statute. Finally there are 54 " bulk or distributing plants," maintained chiefly for the storage of petroleum products to be distributed to the stations, but in part as a source of supply from which deliveries are made to buyers.

Chains for the sale of gasoline have units many times more numerous than chains for other purposes. The longest " general commodity " chain is that of the Great Atlantic & Pacific Tea Company with 198 stores within the boundaries of West Virginia. Not only are the gasoline units more numerous, but the sales from any one unit are, comparatively speaking, small, as must always be the case when subdivision is so minute. The result is to cast upon the complainant and upon competing chains in the same business a burden much heavier, both absolutely and relatively to earnings, than any that is borne by others. This is brought out clearly through statistical tables in the record. The store license fees from all sources during the year 1933 amounted to $569,693. Of this total, stores other than gasoline stations contributed $83,525 (single stores $21,723, and multiple stores $61,-802). Single gasoline stations, maintained by independent dealers, 2,000 in number, contributed $5,000, and chain gasoline stations $481,168, or 84.46% of the whole. Five oil companies including the complainant paid $476,171 or 83.5%, and the complainant alone paid $240,173 or 42.16%. Other tables supply the data for a comparison between the business done by the gasoline chains and that

of chains for other purposes. If we look to the year 1932, the latest year for which complete figures are forthcoming, 2,453 gasoline chain stations did an aggregate business of $15,198,638, or 4.6% of the total chain business of the state, yet they would have paid 84.46% of the tax if the law had been in force during that year; 1,889 general retail stores in chain organizations did a total business of $75,454,257, or 22.9% of the whole, and would have paid 10.7% of the tax, this because the number of the units was relatively small. In 1932 the average gross revenue of the complainant's gasoline stations was $26,822 for each of the company-owned stations, and $3,892 for each of the agency stations, the company-owned stations making by far the better showing. During the same year the average net income for company stations was $1,782.78 (it had been more than double in 1931), and for agency stations only $89.75. Upon that basis a tax of $250 would have left a profit for the one group, but a loss for the other. In the computation of this loss, a word may be of use as to the bookkeeping methods in vogue in the complainant's business. The complainant's practice has been to bill the gasoline to its stations at the current market prices, as if there were a sale to strangers. Such a mode of segregation, unless corrected by other data, will give at times a partial picture of the economic situation. If the price at which the oil is billed includes a reasonable profit for refining and transporting, the business may show a gain when viewed in all its parts, though the later work of marketing is carried on at cost or less. Stations scattered far and wide address a mass appeal to customers, and thus stimulate them to buy at the sign that has made itself familiar. True, the complainant lost money in the process of refining from 1930 to 1933, but for anything that is shown, the loss had its origin in the general economic depression prevailing in those years. Even so, there can be no denial that service filling stations, when organ-

ized in chains, bear a heavier and harsher burden than chains whose units are fewer and yet individually larger.

Impatient of that burden, the complainant brought this suit in June, 1933, to restrain the State Tax Commissioner from paying into the treasury of the state the sum of $240,173.50 paid under protest as the license taxes of the year. The reason for resort to equity was the uncertainty as to the existence of any remedy at law for the recovery of the taxes when once the moneys were deposited in the treasury, and subjected thereby to the state's ownership and power. In its bill of complaint the complainant took the ground that the exactions were illegal, first, because the gasoline stations were not stores within the meaning of the statute, and, second, because even though they were, the imposition of taxes was a denial to the complainant of immunities secured by the equal protection clause and the due process clause of the Fourteenth Amendment, and also by provisions of the constitution of the State. A District Court of three judges, organized in accordance with § 266 of the Judicial Code (28 U. S. C. § 380), heard the complainant's application for interlocutory and permanent relief. The court decided, after a careful review of the West Virginia statutes, that there was an imperfect remedy at law which made permissible resort to equity. In that conclusion we concur. The court decided also that the operation of the tax in its application to chains of gasoline stations was so much harsher and heavier than the operation of the tax when applied to other chains as to constitute a denial to the complainant of the equal protection of the laws. Finally the court decided that gasoline stations were not stores within the meaning of the statute. 6 F. Supp. 494. The decree enjoined the payment of the contested fees into the treasury of the State, and ordered restitution. An appeal to this court followed.

*First.* The filling stations and distribution plants are stores or mercantile establishments within the meaning of the statute.

By § 8, " the term ' store ' as used in this act shall be construed to mean and include any store or stores or any mercantile establishment or establishments which are owned, operated, maintained and/or controlled by the same person, firm, corporation, copartnership, or association, either domestic or foreign, in which goods, wares or merchandise of any kind, are sold, either at retail or wholesale."

There is no doubt that goods, wares and merchandise of a kind, i. e., gasoline and other petroleum products, and even tires and other automobile accessories, are sold by the complainant and its agencies at its plants and service stations. This satisfies the test of the statute, and subjects the seller to the tax. We are told that the average man if requested to point out to a stranger the store nearest by or even the nearest mercantile establishment would not be likely to think of a filling station as within the range of the inquiry.* *Wadhams Oil Co.* v. *State,* 210 Wis. 448; 245 N. W. 646, 649;. also 246 N. W. 687. There might be force in this suggestion if the statute had left the meaning of its terms to the test of popular understanding. Instead, it has attempted to secure precision and certainty by rejecting a test so fluid and indeterminate and supplying its own glossary. The goods offered for sale are to be understood as having reference to goods " of any kind," and the place at which the sale is made shall include not only places that in the common speech of men would be designated as stores, but, broadly speaking, any mercantile establishment,

---

* Filling stations are ranked as stores by students of the chain store problem: Zimmerman, The Challenge of Chain Store Distribution, p. 52.

whether a store or something else. In such circumstances definition by the average man or even by the ordinary dictionary with its studied enumeration of subtle shades of meaning is not a substitute for the definition set before us by the lawmakers with instructions to apply it to the exclusion of all others. Cf. *Midwestern Petroleum Corp.* v. *State Board of Tax Commissioners,* 206 Ind. 688; 187 N. E. 882. There would be little use in such a glossary if we were free in despite of it to choose a meaning for ourselves.

Extrinsic tokens of intention, however, are not lacking altogether, and though their force may not be great, they point us the same way. In the passage of the bill through the Senate, an amendment was proposed whereby the definition of a store in § 8 was to be supplemented by the following proviso: " Provided, however, that the term ' store ' shall not include filling stations engaged exclusively in the sale of gasoline and other petroleum products." The amendment was put to a vote and rejected. What was done in that connection is doubtless not conclusive as to the meaning of the bill in the unamended form. *Murdock* v. *Memphis,* 20 Wall. 590, 618. It is, however, a circumstance to be weighed along with others when choice is nicely balanced. *Finlayson* v. *Shinnston,* 113 W. Va. 434, 437; 168 S. E. 479; cf. *United States* v. *United Shoe Machinery Co.,* 264 Fed. 138, 174; *Lapina* v. *Williams,* 232 U. S. 78, 89. Reinforcing this token is the contemporaneous interpretation of the statute by the Tax Commissioner of the State, the administrative agent charged with its enforcement. *Fawcus Machine Co.* v. *United States,* 282 U. S. 375, 378. We give to such construction " respectful consideration," though we have power to disregard it. *United States* v. *Moore,* 95 U. S. 760, 763; *Fawcus Machine Co.* v. *United States, supra.* The complainant was at liberty to maintain a suit in the state courts, where the meaning of the statute could have

been determined with finality. It chose to have recourse to the courts of the nation. In such circumstances we are charged with a duty of independent judgment (*Siler* v. *Louisville & Nashville R. Co.*, 213 U. S. 175, 194; *Hurn* v. *Ousler*, 289 U. S. 238, 243), but in default of other tests, we lean to an agreement with the agents of the state.

*Second.* The statute in its application to the complainant and others similarly situated does not deny to the taxpayer the equal protection of the laws.

The inquiry divides itself into two branches which call for separate consideration. Is a series of filling stations a chain of such a kind as to be subject to a different measure of taxation from stations in separate ownership? This question was answered by the court below in favor of the State, but it is still pressed in this court by counsel for the complainant. If the stations in a chain may be taxed differently from independent units and the amount of the tax fixed upon a graduated basis, is the graduation in its consequences so extreme, so disproportionate to benefits, as to be an arbitrary discrimination between longer chains and shorter ones, or between chains for the sale of gasoline and for the sale of other products? This question was answered by the court below in favor of the taxpayer.

(1) We think a series of gasoline stations maintained in a single ownership has the benefit of chain organization in such a sense and measure as to fall within the scope of the decisions of this court in *State Board of Tax Commissioners* v. *Jackson*, 283 U. S. 527, and *Liggett Co.* v. *Lee*, 288 U. S. 517. The opinion in Jackson's case enumerates some of the advantages of chain store operation, and finds a sufficient basis for taxing chains differently from stores separately owned. The opinion in Liggett's case makes it clear that the list of benefits was for illustration only, but that in every " integrated chain," whatever its particular quality, there is something constant and distinctive which marks it off from stores main-

tained in separate ownership, and even from those combining in coöperative leagues. 288 U. S. at p. 532. The complainant in this suit returns to the same method of attack, picking out one feature of management after another from the list in Jackson's case, as if what was enumerated there were a code to which every chain is to conform if it is to be subject to taxation in accordance with a special system. The method is deceptive, yet many of the chief benefits found in the structure of other integrated chains will be discovered to be present here.

We have here abundant capital; standardization in equipment and display; superior management; more rapid turnover; uniformity in store management; special accounting methods; and a unified sales policy coördinating the diverse units. The complainant receives the crude oil from a subsidiary company, which produces one-third of what it sells and buys two-thirds from others, these others, for all that appears, being affiliated corporations. The oil when delivered is refined by the complainant, and then billed to itself, that is to its stations and agencies, at current market rates. Through all these far flung instruments it distributes its own products and spreads through every hamlet its repute as a distributor. Ownership or control of a host of well-appointed depots, uniform in design and color, has put the chains in a position to bring home to the consuming public the knowledge of their wares and of the quality of their service in a way far beyond the capacity of the independent dealer with one station or a few. The mere statement of the number of depots maintained by the complainant—1,000 separate centres of attraction and distribution—must bear persuasive witness to the tremendous potencies of advertisement, of reiterated suggestion, inherent in a business conducted on such a scale. The results confirm the prophecy. There are 4,453 filling stations in West Virginia. Of these only 55% are members of a chain, yet this 55%

has been able to make 75% of the sales of motor fuel. True the complainant has been willing to loan its distinctive labels and equipment to independent operators dealing in its products, and even to paint their stations so that they will seem to be its own. This practice has been discontinued since the passage of the National Recovery Act and the adoption of a code thereunder. Even before that time, however, the gasoline was billed to independents at a price one-half cent per gallon higher than the price payable by agencies acting on a commission basis. The discrimination may mean the difference between a profit and a loss. More important is this, that the effect of multitudinous agencies, reaching into every corner, and yet subject to regulation at a centre, is to fix a uniform retail price to which independents must conform as the price of their existence. They are independent in name only, for the chain sets the pace, and even in competing they are subject to its mastery. They are reminded every hour that a chain efficiently conducted, with ample capital behind it, is able to attract the public in a degree impossible for others. Indeed, some of them are driven to pose as members of the chain by borrowing its insignia in order to share its popularity. The popularity would be unattainable without a multiplicity of units repeating the same message.

(2) Chains of gasoline stations being subject like other chains to a graduated tax, the question remains whether the rates are so oppressive as to amount to arbitrary discrimination or to unlawful confiscation.

When the power to tax exists, the extent of the burden is a matter for the discretion of the lawmakers. The subject was fully considered in *Magnano Co. v. Hamilton*, 292 U. S. 40, decided at the last term. "Even if the tax should destroy a business, it would not be made invalid or require compensation upon that ground alone. Those who enter upon a business take that risk." *Alaska Fish*

*Co.* v. *Smith,* 255 U. S. 44, 48, quoted in *Magnano Co.* v. *Hamilton, supra,* p. 46. True the reservation was made (292 U. S. at p. 44) that an act might be so arbitrary as not to be an exercise of the taxing power at all, the form of a tax being a cloak for something else. Cf. *Child Labor Tax Case,* 259 U. S. 20. In respect of the challenged act, there is neither evidence nor even claim of any such abuse. On the contrary, the complainant has stated in its bill that the " act is, in effect, a tax measure," its validity or invalidity to be adjudged upon that basis. A chain, as we have seen, is a distinctive business species, with its own capacities and functions. Broadly speaking its opportunities and powers become greater with the number of the component links; and the greater they become, the more far-reaching are the consequences, both social and economic. For that reason the state may tax the large chains more heavily than the small ones, and upon a graduated basis, as indeed we have already held, *State Board of Tax Commissioners* v. *Jackson, supra; Liggett Co.* v. *Lee, supra.* Not only may it do this, but it may make the tax so heavy as to discourage multiplication of the units to an extent believed to be inordinate, and by the incidence of the burden develop other forms of industry. *Quong Wing* v. *Kirkendall,* 223 U. S. 59; *American Sugar Refining Co.* v. *Louisiana,* 179 U. S. 89, 95; *Southwestern Oil Co.* v. *Texas,* 217 U. S. 114, 126; *Sproles* v. *Binford,* 286 U. S. 374, 394; *Stephenson* v. *Binford,* 287 U. S. 251. In principle there is no distinction between such an exercise of power and the statute upheld in *Magnano Co.* v. *Hamilton, supra,* whereby sales of butter were fostered and sales of oleomargarine repressed. A motive to build up through legislation the quality of men may be as creditable in the thought of some as a motive to magnify the quantity of trade. Courts do not choose between such values in adjudging legislative powers. They put the choice aside as beyond their lawful competence. " Collateral

purposes or motives of a legislature in levying a tax of a kind within the reach of its lawful powers are matters beyond the scope of judicial inquiry." *Magnano Co.* v. *Hamilton, supra,* at p. 44; *McCray* v. *United States,* 195 U. S. 27, 56. The tax now assailed may have its roots in an erroneous conception of the ills of the body politic or of the efficacy of such a measure to bring about a cure. We have no thought in anything we have written to declare it expedient or even just, or for that matter to declare the contrary. We deal with power only.

The argument against the statute rings the changes upon a comparison between the position of the gasoline chains and that of chains for other products. The gasoline chains,* as already noted in this opinion, have units more numerous by far than those that deal in other things, and because of their size must pay a large percentage of the tax, though it is not to be forgotten that there are general commodity chains also within the upper brackets. The outcome is no evidence of an arbitrary discrimination, defiant of the restraints of law. All members of a class within the same graduated levels are treated impartially and subjected to an equal rule. *Magoun* v. *Illinois Trust & Savings Bank,* 170 U. S. 283, 293, 296. If only one form of chain chooses so to multiply its units, after arriving at the topmost levels, as to make the burden heavy, it owes its position on the scale and the aggravation of the tax to the exigencies of business and not to those of law. The classification is not arbitrary, but in its normal operation has a rational relation to the subject matter to be taxed, the capacity to pay, and the justice of the payment. Cf. *Magoun* v. *Illinois Trust & Savings Bank, supra; Knowlton* v. *Moore,* 178 U. S. 41, 54; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61; *Lake Shore & Michigan*

---

* The Standard Oil Co. of New Jersey, Sinclair Refining Co., Ashland Refining Co., Pure Oil Co., and Gulf Refining Co.

*Southern Ry. Co.* v. *Clough,* 242 U. S. 375, 385; *Maxwell* v. *Bugbee,* 250 U. S. 525, 540, 541; *Watson* v. *State Comptroller,* 254 U. S. 122, 124; *State Board of Tax Commissioners* v. *Jackson, supra,* at p. 537. We have never yet held that government in levying a graduated tax upon all the members of a class must satisfy itself by inquiry that every group within the class will be able to pay the tax without the sacrifice of profits. The operation of a general rule will seldom be the same for every one. If the accidents of trade lead to inequality or hardship, the consequences must be accepted as inherent in government by law instead of government by edict.

*Third.* The statute does not violate the constitution of West Virginia which requires that taxation shall be equal and uniform throughout the state. Article 10, § 1.

The constitution of Indiana has a like provision which was considered by this court when sustaining the chain store tax in *State Board of Tax Commissioners* v. *Jackson, supra,* at p. 542. The view was expressed that the standard of uniformity under the constitution of the state was substantially the same as the standard of equality under the Fourteenth Amendment of the constitution of the nation.

Not finding that the courts of West Virginia have spoken on the subject differently, we reach the same conclusion now. *Louisville & Nashville R. Co.* v. *Garrett,* 231 U. S. 298, 305. Cf. *Laing* v. *Fox,* 115 *W. Va.* 272; 175 S. E. 354, 359; *Hope Natural Gas Co.* v. *Hall,* 102 W. Va. 272; 135 S. E. 582; *Pipe Line Co.* v. *Hallanan,* 87 W. Va. 396; 105 S. E. 506; *Virginia* v. *Bibee Grocery Co.,* 153 Va. 935; 151 S. E. 293; *Great Atlantic & Pacific Tea Co.* v. *Maxwell,* 199 N. C. 433; 154 S. E. 838; *Moore* v. *State Board of Charities & Corrections,* 239 Ky. 729; 40 S. W. (2d) 349; *Standard Lumber Co.* v. *Pierce,* 112 Ore. 314; 228 Pac. 812.

*Fourth.* What has been said in respect of the contention that the tax has the effect of an arbitrary discrimination is a sufficient answer to the contention that property has been taken without due process of law.

The decree is reversed and the cause remanded for further proceedings in accordance with this opinion.

*Reversed.*

MR. JUSTICE VAN DEVANTER, MR. JUSTICE McREYNOLDS, MR. JUSTICE SUTHERLAND, and MR. JUSTICE BUTLER, accepting the opinion and concurring opinion of the court below as embodying a sound and correct view of the law applicable to the first and second points discussed in the opinion just delivered, think the judgment should be affirmed.