# 𝕾taunton

COMMONWEALTH OF VIRGINIA v. WHITING OIL COMPANY, INC.

September 11, 1936.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Eggleston, JJ.

The opinion states the case.

*Abram P. Staples, Attorney-General, W. W. Martin, Assistant Attorney-General,* and *Henry R. Miller, Jr.,* for the Commonwealth.

*Moss A. Plunkett* and *Woods, Chitwood, Coxe & Rogers,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

We are to determine if a certain property in the city of Roanoke under lease and operated by the Whiting Oil Company, Inc., is a garage within the purview of the Tax Code of Virginia.

That company was charged with conducting such a busi-

ness without having first obtained the license required by statute. It was tried and found not guilty.

Section 180 of the Tax Code reads:

"Garages.—Every person who shall keep a garage for the storage or hire of motor vehicles, in counties, and in towns of less than two thousand inhabitants, shall pay the sum of fifteen dollars, and an additional sum of fifty cents for the storage capacity in excess of five motor vehicles, and in towns of two thousand inhabitants and over, he shall pay twenty-five dollars and an additional tax of fifty cents for the storage capacity for over five motor vehicles, and in cities of the second class, he shall pay a tax of thirty-five dollars, and fifty cents additional for each vehicle for the storage capacity of each vehicle over five, and in cities of the first class he shall pay a tax of fifty dollars, and one dollar additional for each vehicle for the storage capacity of each vehicle over five. The license to keep a garage by the proprietor of public watering places and other places of summer resort, or any person at such places, for six months or less, shall be one-half of the sums hereinbefore specified. A garage, as used in this section, means every place where five or more motor vehicles are stored or housed at any time for compensation." Acts of Assembly, 1928, chapter 45, pages 35-115. (Tax Code 1930, Appendix, page 2174.)

This act practically in its present form appears in chapter 522, page 947, of the Act of 1916. Defendant contends that it was passed long before the advent of parking lots and so does not apply. We may concede that this was true in 1916, but in 1928 conditions were in substance as they now are.

What were they in 1928? Parking lots were then and are now everywhere common, and so we look to the situation as it is today and not as it was in 1916, and particularly to the situation in the Whiting lot.

It fronts 85 feet on the north side of Salem avenue and extends through to Norfolk avenue, abutting approximately 125 feet on the latter. In its front is an ordinary gasoline station, operated by this oil company. On its sides and rear are walls. Extending inside from these walls is an open-shed

roof supported on the rear by the outside walls and on the front by posts. These upright posts are so spaced as to leave room for one automobile between each line of posts, thus making separate "stalls" for fifty-nine cars. There are no partition walls between the stalls and no enclosure of any kind in front. The stalls are numbered serially.

In the center of the lot, which is not under roof, there are spaces marked off on the ground just large enough to accommodate in each one parked automobile.

For these open stalls under roof $5 a month is charged. A specific stall is assigned to the customer and marked either with his name or merely the word "private" as he may prefer. The stall may not be used by any other person, or even by the Whiting Oil Company. The customer drives the car himself into the stall and takes it out. He retains the key. The car never comes into the possession or custody of the Whiting Oil Company and the latter assumes no responsibility whatever for it. The car is never touched by an employee of the Whiting Oil Company unless the owner, as is sometimes the case, leaves the car at a gas pump with the request that after gas has been put in the car, an attendant at the filling station place it in the stall. In that event, the keys are left at the filling station until called for by the owner.

Stalls not taken by the month are given to others for a less time and for a less price. Others are permitted to park in the open and not under roof at rates under those charged for the stalls.

The statute itself tells us when this license is to be levied. It is to be levied where five or more vehicles are stored or housed at one time for compensation. Here their number and the compensation paid is not in dispute.

The legislature has undertaken to tell us when this statute shall apply.

"It is well settled that a legislative body has the power within reasonable limitations to prescribe legal definitions of its own language and when an act passed by it embodies a definition it is binding on the courts." R. C. L., vol. 25, page 1049; *Fox* v. *Standard Oil Company of New Jersey*, 294 U. S.

87, 55 S. Ct. 333, 339, 79 L. Ed. 780.

We do not understand that this rule is questioned, but it is contended that these automobiles in stalls paid for as aforesaid are neither stored nor housed, and so we must weigh these terms as defined by standard authorities.

Webster's International Dictionary tells us that to house is a synonym of to shelter. Among the definitions of the verb "house," in the Century Dictionary, are these: "Put or keep under a roof; cover; shelter; protect by covering." Soule, in his Dictionary of English Synonyms, gives us this definition among others: "Shelter, protect, put under cover (of a roof)."

And the same definition appears in Roget's Thesaurus. There to house is to "shelter, harbor, protect."

If there were doors to these stalls, no one would for a moment claim that they were not housed, but nowhere do we find that doors are necessary. Most houses have them but not all. For the purposes of this case there must be adequate shelter under roof. A farmer who puts his binder under a shed for protection has housed it, and would doubtless think that a door was unnecessary. One has housed his cattle when he has put them under a shed and out of the storm.

We reach the conclusion that these automobiles placed under roof in private rented stalls are housed for compensation within the meaning of the statute. It is not necessary that we determine what to store means. Probably it connotes some more permanent arrangement. We store our furs for the summer and sometimes store away our automobiles out of commission for the winter.

It is also said that the statute in judgment is unconstitutional in that there is a denial of the equal protection of the law. Equality and uniformity in taxation, while desirable, is impossible. *Norfolk* v. *Snyder*, 161 Va. 288, 170 S. E. 721; *State Railroad Tax Cases*, 92 U. S. 575, 23 L. Ed. 663.

Moreover, section 168 of our Constitution, requiring equality and uniformity of taxation in theory, applies only to a direct tax on property, and not to license taxes. *Com-*

*monwealth* v. *Bibee Grocery Company*, 153 Va. 935, 151 S. E. 293.

Classification for the purposes of taxation is a lawful device, commonly resorted to, is at times necessary, and must be sustained if it rests upon any reasonable basis.

"One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 31 S. Ct. 337, 340, 55 L. Ed. 369, Ann. Cas. 1912C, 160; *Louis K. Liggett Co.* v. *Lee*, 288 U. S. 517, 53 S. Ct. 481, 483, 77 L. Ed. 929, 85 A. L. R. 699; *Carpel* v. *City of Richmond*, 162 Va. 833, 175 S. E. 316, 318; *Commonwealth* v. *Bibee Grocery Co., supra.*

"Classification, unless essentially arbitrary, rests in the judgment of the legislature." *Carpel* v. *City of Richmond, supra.* Many instances of it appear in our Tax Code. Auctioneers pay a flat fee of $50 and more in towns of over five thousand inhabitants,—section 164 (Tax Code 1930, Appendix, page 2170). Livery stable keepers pay $7.50 in towns of less than two thousand and more in larger places,—section 185 (Tax Code 1930, Appendix, page 2177). The license to restaurant keepers is graduated by the size of the community in which they do business,—section 197 (Tax Code 1930, Appendix, page 2183, as amended by Acts 1932, chapter 225, page 414); and the same system is followed where undertakers are licensed,—section 202. Other instances might be cited but these suffice to show the policy of the State. All of these charges, as are those here under review, are predicated upon what was believed to be a fair estimate of the relative value of privileges conferred.

If the classification be lawful, the fact that it may at times bear heavily upon some member of a class will not invalidate it.

"Some injustice is bound to result from any general rule of classification, and equal protection demands only reasonable uniformity in dealing with parties similarly cricumstanced." *Stewart Dry Goods Co.* v. *Lewis*, 294 U. S. 550, 55 S. Ct. 525, 531, 79 L. Ed. 1054.

"If the accidents of trade lead to inequality or hardship, the consequences must be accepted as inherent in government by law instead of government by edict." *Fox* v. *Standard Oil Company of New Jersey, supra.* Also *State Board of Tax Commissioners of Indiana* v. *Jackson,* 283 U. S. 527, 51 S. Ct. 540, 543, 75 L. Ed. 1248, 73 A. L. R. 1464; *Carpel* v. *City of Richmond, supra.*

▮ It is argued that the State has no interest in the location of a licensed garage; that its interest ceases when a license has been levied and paid; but cities may charge varying sums and do so under a State grant. The State may do directly those things which it may do through its subordinate agencies.

Defendant relies upon the recent cause of *Stewart Dry Goods Co.* v. *Lewis, supra,* and in substance rests its case upon that authority. There a Kentucky statute was under review which levied a sales tax of one-twentieth of one per cent on gross sales of $400,000 or less, two-twentieths of one per cent on the excess of gross sales over $400,000 and not exceeding $500,000, etc.

In closing his opinion Mr. Justice Roberts said:

"The law arbitrarily classifies these vendors for the imposition of a varying rate of taxation, solely by reference to the volume of their transactions, disregarding the absence of any reasonable relation between the chosen criterion of classification and the privilege the enjoyment of which is said to be the subject taxed. It exacts from two persons different amounts for the privilege of doing exactly similar acts because the one has performed the act oftener than the other."

The substance of that case as we see it is that there must be some relation between the value of the privilege and the license charged therefor.

That the value in the instant case of this privilege varies is conceded. "For it would seem reasonable to assume that the larger the community, the greater the volume of business and proportionate net profit that the proprietor could expect to receive." Defendant's Brief.

The right to conduct a garage in Richmond reasonably holds out greater possibilities for profit than if it were lo-

cated at Glade Spring, and it is upon this theory that our statute is framed. It is perfectly true that the Glade Spring garage might be extraordinarily successful, patronage might be large and profits great, but statutes can not be framed to meet improbable possibilities. The value of this privilege within fair limits must be left to the judgment of the legislature. The *Stewart Case* expressly recognizes the legality of surcharges on chain stores and that because of advantages supposed to be incident to their multiplication. See *Fox* v. *Standard Oil Company, supra; State Board of Tax Commissioners of Iindiana* v. *Jackson, supra.* The value of location and the power to impose special regulations was recognized in *W. W. Cargill Co.* v. *Minnesota*, 180 U. S. 452, 21 S. Ct. 423, 45 L. Ed. 619, where it was held that a license might be required of a warehouse situated on a railroad, but not for one elsewhere placed although doing the same business.

Moreover, the *Stewart Case* reaffirmed *Clark* v. *Titusville*, 184 U. S. 329, 22 S. Ct. 382, 46 L. Ed. 569. There "tax levied consisted of a flat fee exacted for a license which entitled the merchant to conduct a business for the ensuing year. The lowest fee was $5 for a merchant who during the year preceding that covered by the license had made sales not in excess of $1,000. A $10 fee applied to one who had sales between $1,000 and $2,500, a $15 fee to one having sales between $2,500 and $5,000, a $25 fee to one whose sales were between $5,000 and $10,000, and so on to a fee of $100 for the seller of $60,000 worth or more.

Mr. Justice Roberts, in commenting, said:

"A second objection was that the percentage of tax to sales was greater in the lower than in the higher brackets—that is, that a merchant selling goods for $60,000 or more paid a less percentage of his sales by way of tax than the smaller merchant who sold only $1,000 worth of goods. The objection was unavailing, because the tax did not purport to be fixed upon a percentage of sales. The purpose was to charge a larger license fee to a larger business."

It was conceded that this scale of charges might at times prove to be inequitable, but such results usually follow

all general classification. The purpose of our statute is to charge a larger license fee where a larger business is to be expected, but it is not fixed upon a percentage of gross sales or upon gross income. Plainly the opportunities in cities are greater than are those in small communities. It is upon this basis that these charges are assessed. They are not arbitrary and so the matter rested within the sound discretion of the legislature.

For reasons stated, we are of opinion that the judgment of the court below should be reversed and the case remanded. It is so ordered.

*Reversed and remanded.*