90 So.2d 732

**DIXIE FINANCE COMPANY**

v.

**CITY OF DEMOPOLIS.**

**DEMOPOLIS FINANCE COMPANY**

v.

**CITY OF DEMOPOLIS.**

**2 Div. 303, 305.**

Supreme Court of Alabama.

Nov. 15, 1956.

Pitts & Pitts, Selma, and Henry Mc-Daniel, Demopolis, for appellant Dixie Finance Co.

Henry H. Mize and Jonas Spiro, Jr., Mize & Spiro, Tuscaloosa, and Henry Mc-Daniel, Demopolis, for appellant Demopolis Finance Co.

W. W. Dinning and H. A. Lloyd, Lloyd & Dinning, Demopolis, and Douglas Arant and John J. Coleman, Jr., White, Bradley, Arant, All & Rose, Birmingham, for appellee.

GOODWYN, Justice.

Pursuant to authority given by Code 1940, Tit. 37, § 735, the City of Demopolis adopted a general license ordinance for the year 1951 providing, in pertinent part, as follows:

"Section 1. That every person, firm or corporation engaging in or carrying on any exhibition, trade, business, vocation, occupation, or profession within the City of Demopolis, Alabama, during the year 1951, shall take out and pay for an annual license for the

privilege of engaging in or carrying on such exhibition, trade, business, vocation, or profession, as follows:

\* \* \* \* \* \*

"169.   Loan  Office.........$2500.00

"The term 'Loan Office' shall be defined as follows: Any person, co-partnership or corporation engaging in the business of making loans of money or things in action in the amount of Three Hundred Dollars ($300.00) or less; but not including loans made to the tenants of such person, firm or corporation engaged in agriculture, nor to loans to persons whose principal business is farming, nor the business of financing the purchase of motor vehicles, refrigerators or other personal property which is purchased from the lender, nor shall it apply to credit unions as defined by law, nor to savings and loan associations as defined by law, nor to any bank organized and existing under the laws of the State of Alabama or under the laws of the United States, nor to loans insured or guaranteed by the United States or any of its agencies."

We here note that the exclusion provision of schedule 169 is the same as that contained in the Harris Act, Act No. 159, appvd. June 23, 1945, Gen.Acts 1945, § 12, pp. 200, 203, regulating the business "of making loans of money or things in action in the amount of three hundred dollars ($300.00) or less", and in Act No. 787, appvd. Sept. 11, 1951, Acts 1950–51, § 14, pp. 1385, 1392, amending the Harris Act.

The Dixie Finance Company, Southern Finance Company, and Demopolis Finance Company engaged in such loan business in Demopolis and became subject to said license. Each of these companies paid the prescribed $2500 under protest and then filed a claim with the City Clerk for its repayment. The claims being denied by the city, these companies brought suits in the circuit court of Marengo County to recover the amounts so paid. Each of the complaints consists of three counts, the first two being common counts. The third count in each case, relied on by the plaintiffs, contains the following allegations:

" \* \* \* that said Section 169 of said license code was arbitrary, unreasonable and confiscatory; that said Section 169 was unconstitutional and would result in the deprivation of the property of the plaintiff in violation of the Constitution of the United States and in violation of the Constitution of the State of Alabama; that said Section 169 was not passed in good faith for the purposes of raising revenue for the City of Demopolis, but was passed for the purpose of prohibiting and preventing the plaintiff from carrying on a lawful and useful business within the City of Demopolis; \* \* \* that said license is so unreasonable and excessive as to amount to the prohibition of the carrying on of a legitimate and useful trade or occupation within the City of Demopolis; that said license or tax is void in that it is imposed upon such terms and conditions as to operate as the virtual prohibition of a useful or lawful business or trade. \* \* \* "

By agreement, the three cases were tried together. The evidence was taken orally before the trial court without a jury. Judgment in each case was rendered in favor of the city. All three plaintiffs took an appeal. Thereafter, prior to submission here, the Southern Finance Company dismissed its appeal. By agreement, the appeals in the other two cases were submitted together on one transcript.

The trial court wrote an opinion, the same in each case, making certain factual findings and giving the basis for its decision. It seems to us that that opinion adequately states the case. The opinion is as follows:

"The plaintiff sues to recover from the defendant the sum of $2,500, with interest thereon, paid by the plaintiff to the defendant as a license tax for the year 1951

pursuant to Section 169 of the License Code of the City of Demopolis for that calendar year, which license code was introduced in evidence in this cause as plaintiff's Exhibit 9. Counts one and two of the plaintiff's complaint are on the common counts. Count three of the plaintiff's complaint alleges among other things that said Section 169 of the License Code is arbitrary, unreasonable and confiscatory, and hence invalid under the Constitution of the United States and of the State of Alabama.

"By Section 169 of the License Code a license tax in the sum of $2,500 was imposed on the companies engaged in the small loan business in Demopolis. There is no question but that the plaintiff falls within the designation of a 'loan office' as that phrase is defined in the Demopolis Code. The plaintiff paid the tax imposed upon it by that license code, filed appropriate claims for refund, and upon the rejection of such claims filed the complaint in this action. Defendant plead the general issue.

"Findings of Fact

"(1) Prior to January 1, 1951, there were in operation in Demopolis, Alabama, three loan companies, the plaintiffs in this proceedings. Of those three, Dixie Finance Company had been in operation for not more than two months prior to January 1, 1951. Prior to that date Southern Finance Company had been in operation for approximately nineteen months; the Demopolis Finance Company was organized January 1, 1948, as successor to an individual proprietorship which had begun business in Demopolis during 1947.

"(2) The audit report of the City of Demopolis for its fiscal year 1951 was admitted in evidence. The total receipts by the City of license taxes for its fiscal year 1951, as disclosed by that audit report, aggregate $43,238.68, including receipts from the license tax imposed upon wholesale distributors of gasoline, License Code, Section 129–130. The same audit report discloses aggregate receipts by the City with respect to other taxes imposed by it, such as automobile license, ad valorem taxes and others.

"(3) The results of the plaintiff's operation since its organization in November, 1950, and the results obtained by Southern Finance Company since its organization in May, 1949, and by Demopolis Finance Company since January 1, 1949, are properly summarized as follows:

"Dixie Finance Company

|  | Nov. 1, 1950 to Dec. 31, 1950 | Jan.–Sept. 1951 |
|---|---|---|
| Principal amount of loans made | $8,495.60 | — |
| Total interest charged (i. e. gross income) | 2,730.60 | $7,162.25 |
| Total interest collected | 685.45 | 7,675.85 |
| Net loss per income tax return | (1,991.09) | |
| Estimated net profit or loss for short period ended September 30, 1951 | — | (3,344.03) |

"Southern Finance Company

| | May–Dec. 1949 | Year 1950 | Jan.–Oct. 1950 |
|---|---|---|---|
| Principal amount of loans made | $20,090.10 | $45,967.00 | — |
| Total interest charged (i. e. gross income) | 8,733.55 | 19,380.85 | 14,663.50 (1) |
| Total interest collected | 6,353.55 | 18,728.45 | 14,663.50 |
| Net profits per income tax return | ( 246.90) | 7,165.07 | — |
| Estimated net profit or loss for short period ended 10–30–51 | — | — | 13.50 |

(1) Mr. Schumard's estimate — 

"Demopolis Finance Company

| | Year 1949 | Year 1950 | Jan.–Oct. 1951 |
|---|---|---|---|
| Principal amount of loans made | $51,337.50 | $43,271.00 | — |
| Total interest charged (i. e. gross income) | 22,472.30 | 18,900.40 | $11,667.55 |
| Total interest collected | — | — | — |
| Net profit per income tax return | 14,781.14 | 8,096.25 | — |
| Estimated net profit or loss for short period ended 10–30–51 | — | — | 203.55 |

"(4) The total net investment of the Southern Finance Company was $5,100. The net profit remitted by the Southern Finance Company to its Houston office in 1950 aggregated $6,600, and in 1951, $1,100. Corresponding date for Demopolis Finance Company is, as follows: Net investment at January 1, 1949 was $6,656.80 while profits withdrawn in 1949 aggregated $9,820 and in 1950, $9,150. The entire partners' investment in Dixie Finance Company was borrowed by the partners from banks.

"(5) Typical rates of interest charged by the plaintiff was as follows:

| Amount of Loan | Interest Charged | Amount Repaid | Term of Loan | Interest Rate Per Year |
|---|---|---|---|---|
| $25.00 | $4.80 | $29.80 | 11–16–50 to 12–16–50 | 230.4 % |
| 5.00 | 2.00 | 7.00 | 11–4–50 to 11–11–50 | 2.085.6 % |
| 5.00 | 2.00 | 7.00 | 11–13 to 11–20 | 2,085.6 % |
| 10.00 | 5.60 | ·15.60 | 8 weekly payments | 649 % |
| 15.00 | 7.80 | 22.80 | 8 weekly payments | 600.89% |
| 5.00 | 2.80 | 7.80 | 6 weekly payments | 831.6 % |
| 5.00 | 2.80 | 7.80 | 6 weekly payments | 831.6 % |
| 5.00 | 2.00 | 7.00 | 21 days— 2 payments | 815.29% |

"(6) Rates of interest charged by Southern Finance Company were as follows:

| Amount of Loan | Interest Charged | Amount Repaid | Term of Loan | Interest Rate Per Year |
|---|---|---|---|---|
| $ 5.00 | $ 1.00 | $ 6.00 | 2 weekly payments | 1,386.66% |
| 5.00 | 2.00 | 7.00 | 4 weekly payments | 832 % |
| 5.00 | 2.80 | 7.80 | 6 weekly payments | 832.17% |
| 10.00 | 2.00 | 12.00 | 2 weekly payments | 693.33% |
| 10.00 | 3.40 | 13.40 | 4 weekly payments | 707 % |
| 10.00 | 4.70 | 14.70 | 6 weekly payments | 698.62% |
| 10.00 | 5.60 | 15.60 | 8 weekly payments | 647.11% |
| 15.00 | 5.00 | 20.00 | 4 weekly payments | 693.33% |
| 15.00 | ·7.20 | 22.20 | 6 weekly payments | 713.14% |
| 15.00 | 8.60 | 23.60 | 8 weekly payments | 662.52% |
| 20.00 | 6.40 | 26.40 | 4 weekly payments | 665.6 % |
| 20.00 | 10.00 | 30.00 | 8 weekly payments | 577.78% |
| 25.00 | 7.00 | 32.00 | 4 weekly payments | 582.4 % |
| 25.00 | 13.00 | 38.00 | 8 weekly payments | 300.44% |

| Amount of Loan | Interest Charged | Amount Repaid | Term of Loan | Interest Rate Per Year |
|---|---|---|---|---|
| 50.00 | 10.00 | 60.00 | 4 weekly payments | 416 % |
| 50.00 | 12.00 | 62.00 | 4 weekly payments | 499 % |
| 50.00 | 15.00 | 65.00 | 8 weekly payments | 346 66% |
| 50.00 | 18.80 | 68.80 | 8 weekly payments | 434 % |

Demopolis Finance Company charged identical rates for loans upon like principal amounts with the same maturities.

"(7) For the two months of 1950 in which it was in operation Dixie Finance Company's experience indicated that for a full twelve months' operation it would approximate both in respect of total interest charged and net profits the experience of Southern Finance Company and of the Demopolis Finance Company. In November and December 1950 Dixie charged interest totaling $2,730.60 which on an annual basis would amount to more than $16,000, and made loans in the principal amount of $8,495.60, which on an annual basis would amount to approximately $51,000.

"(8) The expenses of operation of any loan office are relatively higher in its initial period of doing business in a community and are also relatively higher during the period after it ceases to make new loans and enters into liquidation.

"(9) The actual results of the operation of Dixie Finance Company for ten months beginning November 1, 1950 and ending September 30, 1951 are not shown by the record in this case. Substantial interest charged by the plaintiff but uncollected at December 1, 1950 was later received; and Dixie Finance Company had outstanding an amount of interest charged but uncollected at September 30, 1951, but the record does not disclose the precise amount thereof, or what portion might reasonably have been anticipated as collectible.

"(10) The plaintiff paid no ad valorem taxes, no automobile license taxes, and no other taxes to the City of Demopolis during the period of its operation except the business license. Although the City of Demopolis does participate in the excise tax on financial institutions levied by Chapter 18, Title 51 of the Code of Alabama of 1940 as amended, the plaintiff, which commenced business in October 1950 and began the process of liquidation in July 1951, incurred no excise tax liability.

"(11) The withdrawal of Dixie Finance Company from the loan business in Demopolis in July, 1951, and its entry into the process of liquidation, was not in itself a consequence of the imposition of the license tax here at issue. Dixie Finance Company paid the license tax at issue several months prior to its entry into the process of liquidation, and could have remained in business in Demopolis making loans and realizing the net income referable thereto for any additional period of approximately six months, after its entry into the process of liquidation, without paying additional taxes to the City of Demopolis.

"(12) To the extent that the plaintiff realized net losses for the eleven months of its operation from November 1, 1950 to September 30, 1951, such net losses, at least in part, must be ascribed to the extraordinary expense incurred by a loan office in beginning its operation in a community, and to the extraordinary expense incurred by a loan office in the process of liquidation.

"(13) Southern Finance Company incurred average monthly expenses in the ten months January 1, to October 30, 1951, exclusive of the license tax here at issue, approximately $273 greater than its average monthly expenses in 1950, also exclusive of the license tax paid in that year. The fact that Southern Finance Company's operation, from the stand-point of net profits, showed a marked decline in the first ten months of 1951, as compared to the calendar year 1950, must be ascribed in part to that increase in expenses, in part to the' fact that the year-end is one of the most profitable parts of the year in the loan office business, and in part to competition or negligence. or other factors which cannot be legitimately charged to the license tax here at issue.

"(14) Demopolis Finance Company's average monthly expense in 1951, exclusive of the license tax paid in that year, approximated $896.40; and its license tax paid in 1950, approximated $879.51. Demopolis Finance Company's average monthly interest charged in 1950 was $1,575.03, and its average monthly interest charged in 1951 was $1,166.75. The fact that Demopolis Finance Company's operations, from the stand-point of net profits, showed a marked decline in the first ten months of 1951, as compared to the calendar year 1950, must be ascribed in part to that increase in expenses, in part to the decrease in its business, in part to the fact that the year-end is one of the most profitable parts of the years in the loan office business, and in part to competition or negligence or other factors which cannot be legitimately charged to the license tax here at issue.

"(15) The calculation of Southern Finance Company and of Demopolis Finance Company as to results of their operations for the ten months ended October 30, 1951 were based upon estimated bad debt charge-offs which were not entered upon their books, as well as other estimates. The business of the Southern Finance Company was managed by salaried employees who were not partners thereof.

"(16) The business of Demopolis Finance Company and Southern Finance Company was managed by salaried employees who were not partners or proprietors of those firms.

"(17) The license tax imposed by Section.169 of the License Code of the City of Demopolis was not arbitrary, unreasonable and confiscatory.

"(18) The Mayor and Council of the City of Demopolis did not manifestly abuse their power to fix the amount of the license fee payable by the plaintiff for the privilege of doing business in the City of Demopolis in the year 1951.

"Opinion

"The plaintiffs have based their case upon the proposition that the license tax at issue is so unreasonable and excessive in amount as to be confiscatory and prohibitory. It is obvious that Section 169 of the License Code of the City of Demopolis for 1951 is a revenue measure and must be adjudged as such.

"In Ex parte Sikes, the Supreme Court of Alabama defined the criteria by which to determine the question whether a revenue measure is confiscatory or prohibitory in the following language:

" 'No one unvarying price will suit for all places and all circumstances. It seems to us the populousness of the municipality, the profitableness of the business, the character of the business proposed to be licensed, and its effects upon the community, the additional expense necessarily entailed by a police supervision of the business, and perhaps other matters might be mentioned, are all proper subjects of inquiry in arriving at a legal and just conclusion in fixing a price which will not be prohibitory.' [Ex parte Sikes, 1893, 102 Ala. 173, 15 So. 522, 523, 24 L.R.A. 774]

"In that case a license tax of $2,000 was imposed by the City of Troy upon retail liquor dealers, the court pointed out that the City of Troy had the power to regulate but not to prohibit retail liquor dealers, and held that such $2,000 license tax was not prohibitory since the gross profits (i. e. sales less cost of sales but before current expenses) of each of the three liquor dealers in the city averaged about $7,300 per annum. The gross profits of Southern Finance Company for 1950 amounted to $19,-380.85, and those of Demopolis Finance Company for 1950 amounted to $18,900.40. The gross profits of Dixie Finance Company for the first two months of its existence do not provide a proper standard because of the expenses that company incurred in opening its business, and for the other reasons previously mentioned.

"Upon this state of the record, the comment of the Supreme Court in Ex parte Sikes is apt:

" 'We do not think there is anything in this showing which reasonably satisfies the mind that the license required is prohibitory in a business view * *.

" 'It is manifest that, if the purpose of the ordinance was to raise revenue, then it was not intended to be prohibitory. A business which is prohibited cannot yield a revenue from licenses. We do not think there is any foundation for the argument, and the facts of the case, without repeating them, justify this conclusion.'

"The charter of the City of Demopolis (Acts of Alabama 1896–97, page 161, 177) expressly empowers the city to 'regulate pawn brokers'. While there is a distinction between pawn brokers and small loan operators, the distinction is one of form rather than of substance; and the charter power to regulate pawn brokers including the power to regulate small loan operators. In other words, the power of the City of Demopolis with respect to small loan operators is coextensive with the charter power of the City of Troy, which was considered, in Ex parte Sikes, supra.

"The fact that two of the loan companies at Demopolis paid the license and continued in the business significantly indicates that the licenses imposed in the instant case are reasonable in amount. Ex parte Sikes, 1893, 102 Ala. 173, 15 So. 522; Johnson v. Town of Fayette, 1906, 148 Ala. 497, 42 So. 621.

"And upon this issue of prohibition it is also significant that the highest court of a neighboring state does not consider a license tax for revenue purposes of $2,000 per year upon money lenders to be confiscatory or unreasonable. State ex rel. Melton v. Rombach, 1917, 112 Miss. 737, 73 So. 731.

"The plaintiffs rely much upon the decision of the Kentucky court in Salisbury v. Equitable Purchasing Co., 177 Ky. 348, 197 S.W. 813, 815, L.R.A.1918A, 1114. But in that case the net profit of the Equitable Purchasing Company in the year preceding the enactment of the license tax was only 12% of the total investment in the company. In this case the net profit of Southern Finance Company in 1950 ($7,165.07) was approximately 140% of the total investment made in that company ($5,100); while the net profits of Demopolis Finance Company for 1950 ($8,096.25) were approximately 127% of the net amount invested in that company at December 31, 1950 ($6,372.75). More importantly, however, the opinion in the Salisbury case recites that the complaint there alleged that the purpose of the city in enacting the license was to prohibit the small loan business; and that the city had not denied that allegation. Here plaintiff made a similar allegation which was denied by defendant. The trial court in the Salisbury case found from the facts that ' "it was the purpose of the general council to make the license fees in question prohibitive" '; but in this case there is no evidence in this record that such was the intent and purpose of the city in enacting the ordinance. It follows

**276·**

that the decision in the Salisbury case is wholly inapplicable to the tax in question.

"In any event, the courts of this state have held that the relationship between the amount of the tax and the income of the business is the significant consideration; and that a license tax in the approximate amount of 13% of gross income is not confiscatory and is not prohibitory. Ex parte Sikes, 1893, 102 Ala. 173, 15 So. 522, [24 L.R.A. 774]; Johnson v. Town of Fayette, 1906, 148 Ala. 497, 42 So. 621. And the courts of this state have uniformly held that income earned in the year preceding the levy, rather than that earned in the following year, is the proper base. While the amount of business probably to be done in the future is a yardstick, the Mayor and Council would have no way to estimate that other than on the basis of actual results for the preceding year. Williams v. City of Talladega, 1909, 164 Ala. 633, 51 So. 330. It also is the established law in Alabama as in other states that the city may take into consideration that the business 'escape their share of general taxation in the community' as do these plaintiffs. See American Bakeries Co. v. City of Huntsville, 1936, 232 Ala. 612, 615, 168 So. 880.

"In actions such as this one our Supreme Court has repeatedly held that the court will indulge the presumption that the acts and ordinances of the city 'are reasonable and valid, and [that] the burden is upon the one who assails such act or ordinance in this respect to overcome this presumption'. American Bakeries Co. v. City of Huntsville, 1936, 232 Ala. 612, 615-616, 168 So. 880, 883; Western Union Telegraph Co. v. City of Decatur, 1918, 16 Ala. App. 679, 81 So. 199. It is also the established law that ' "the power to license the privilege implies the right to fix the amount of the fees, and the action of a municipal body in fixing a fee will only be disturbed, in case of manifest abuse of that power." ' City of Troy v. Western Union Telegraph Co., 164 Ala. 482, 51 So. 523, 525 [27 L.R. A.,N.S., 627].

"This record is devoid of any basis for a finding that the Mayor and Council of the City of Demopolis are guilty of a manifest abuse of the power to fix the license tax paid by small loan operators in that city."

We emphasize that we are not here concerned with the authority of a municipality, under its police power, to regulate the so-called "short loan" or "loan shark" business. We are dealing only with the question whether the license tax imposed by the city, being for revenue, is invalid because prohibitory or confiscatory of the plaintiffs' businesses. In view of the factual findings of the trial court, the authorities cited in that court's opinion and the additional authorities hereinafter cited, we are unable to say that the trial court erred in holding that the license tax is not prohibitive and that the municipal authorities did not abuse their discretion in fixing the amount of the license.

We now refer to authorities not cited in the trial court's opinion which are also supportive of the judgments in favor of the city.

In Bessemer Theatres v. City of Bessemer, 261 Ala. 632, 75 So.2d 651, 656, the city license tax on motion picture theatres was challenged on the ground that the tax unconstitutionally discriminated against those engaged in such business by charging them vastly greater license fees in proportion to their receipts than those charged other businesses in the city. Although that is not the insistence here, what was said in that case is appropriate. In both cases the question for decision concernes the limits of a city's authority in fixing the amount of licenses for revenue. We quote the following from the Bessemer Theatres case:

"We repeat from the quotation above, as here applicable, the principle that 'Even if the tax should destroy the business (of an individual) it would not be made invalid or require compensation upon that ground alone.

Those who enter upon a business take that risk.' The sole attack made on the city license is the amount of the tax as compared with that charged oth-·er forms of business. But to be stricken on that ground it is also said in the Fox case [Fox v. Standard Oil Co., 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780], supra, that 'an act might be so arbitrary as not to be an exercise of the taxing power, the form of a tax being a cloak for something else.'

\* \* \* \* \* \*

"We do not in any respect question the nature of the business as being useful and harmless. But the rule is that 'the only limitation on license taxation (for revenue) seems to be that it must not be so unreasonable as to show a purpose to prohibit a business which is not in itself injurious to public health or morals.' Mayor & Aldermen of City of Birmingham v. Goldstein, 151 Ala. [473] 474, 477, 44 So. 113, 114, 12 L.R.A.,N.S., 568. If it is prohibitive of a useful and harmless sort of business, its purpose is not to raise revenue and is not an exercise of the taxing power, as said in the Fox case, supra.

\* \* \* \* \* \*

" \* \* \* The whole theory is that taxation cannot be used as a means of ·oppression against a class and 'a carefully devised scheme to produce such inequality' is not permissible.

"As here applied, it means that a city cannot levy such a license as to manifest an intent to prohibit or oppress the motion picture industry or have that result. But to violate the Constitution the purpose and effect, as modernly expressed, must be not alone to exercise the power to raise revenue but to burden with prohibitive or oppressive charges a lawful and harmless sort of business. It is expressed in Magnano Co. v. Hamilton, 292 U.S. 40, 54 S.Ct. 599, 601, 78 L.Ed. 1109, as follows: (The Fourteenth Amendment) 'is applicable to a taxing statute such as the one here assailed (an excise tax on all butter substitutes) only if the act be so arbitrary as to compel the conclusion that it does not involve an exertion of the taxing power, but constitutes, in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property.'

" \* \* \* Special attention was called to American Bakeries Co. v. City of Huntsville, 232 Ala. 612, 168 So. 880, 882. We wish again to refer to that case to quote as follows: 'This power to tax, while inhering in the state, cannot be so used by the state nor by a municipal corporation so as to "embarrass and destroy useful and harmless occupations, that are essential to the prosperity of the people, and thus defeat the very purpose for which the power is conferred"'; and, ' "the power to license an occupation or privilege implies the right to fix the amount of the fee, and the action of a municipal body in fixing a fee will only be disturbed, in case of manifest abuse of that power." ' And, further, 'a license tax, which the ordinance now under consideration attempts to impose on itinerant dealers, cannot be determined by the extent of the business of a single individual.' To the same effect in some respects is State v. Pure Oil Co., 256 Ala. 534, 55 So.2d 843.

"The validity of a license tax is not controlled by its effect on a certain person. City of Troy v. Western [Union] Tel. Co., 164 Ala. 482, 51 So. 523, 27 L.R.A.,N.S., 627. Some persons may well afford to pay the tax and do a lucrative and profitable business (apparently that is true of appellant), while others cannot. Gamble v. City Council of Montgomery, 147 Ala. 682, 39 So. 353."

278

See, also, Mobile Battle House v. City of Mobile, 262 Ala. 270, 78 So.2d 642.

The following is from City of Bessemer v. Bessemer Theatres, 252 Ala. 117, 121, 39 So.2d 658, 662:

"Ordinarily the reasonableness of the license fee imposed as a tax is a question for the taxing power and in the absence of a manifest abuse of discretion, the courts will not interfere. There is a presumption in view of the wide discretion vested in such legislative body that the ordinance is reasonable and valid and the burden rests on one who assails the ordinance in this respect to overcome the presumption. American Bakeries Co. v. City of Huntsville, 232 Ala. 612, 168 So. 880. And the courts will not scrutinize the amount of the tax too narrowly. City of Andalusia v. Fletcher, 240 Ala. 110, 198 So. 64. * * *"

From Franks v. City of Jasper, 259 Ala. 641, 646, 647, 68 So.2d 306, 311, is the following:

" * * * When the question as to the reasonableness of a municipal ordinance is raised and the ordinance has reference to a subject matter within the corporate jurisdiction, it will be presumed to be reasonable unless the contrary appears on the face of the law itself or is established by proper evidence. Van Hook v. City of Selma, supra [70 Ala. 361, 45 Am.Rep. 85]; Town of Oxanna v. Allen, 90 Ala. 468, 8 So. 79; Gamble v. City Council of Montgomery, 147 Ala. 682, 39 So. 353; Giglio v. Barrett, 207 Ala. 278, 92 So. 668; Walden v. City of Montgomery, supra [214 Ala. 409, 108 So. 231]; City of Birmingham v. Wilson, supra [27 Ala.App. 288, 172 So. 292, certiorari denied, 233 Ala. 410, 172 So. 295]; City of Prichard v. Harold, supra [28 Ala.App. 235, 186 So. 499; certiorari denied, 237 Ala. 277, 186 So. 504]; City of Andalusia v. Fletcher, supra

[240 Ala. 110, 198 So. 64]; City of Prichard v. Richardson, supra [245 Ala. 365, 17 So.2d 451].

"In view of this principle, the burden rests upon the licensee to demonstrate any claim of invalidity. Walden v. City of Montgomery, supra; City of Andalusia v. Fletcher, supra; Standard Chemical & Oil Co. v. City of Troy, supra [201 Ala. 89, 77 So. 383, L.R.A. 1918C, 522]. See City of Bessemer v. Bessemer Theatres, 252 Ala. 117, 39 So.2d 658; American Bakeries Co. v. City of Huntsville, 232 Ala. 612, 168 So. 880; City of Birmingham v. Louisville & N. R. Co., 216 Ala. 178, 112 So. 742."

The following from American Jurisprudence are statements of the general rule with respect to fixing the amount of a municipal revenue license:

40 Am.Jur., Pawnbrokers, etc., § 13, p. 704.

"§ 13.—Excessiveness of License Fee.—The amount of a license or tax imposed upon moneylenders is largely a matter of legislative discretion with which the courts hesitate to interfere; however, this rule is subject to the limitation that the license or tax imposed should not amount to a prohibition of the business, for there can be no doubt that the business is a useful, legitimate occupation. Doubtless, persons engaged in such business do frequently take advantage of the needy circumstances of those desiring to borrow, and exact a rate of interest far in excess of that allowed by law, but this merely presents a need for regulation. The taxing power should not be used to drive them out of existence. * * *"

38 Am.Jur., Municipal Corporations, § 352, pp. 42-43.

" * * * A municipal corporation having the power to tax occupations carried on within its limits has the ex-

clusive right to decide what occupations shall be taxed, what shall not be taxed, and what the rate of taxation shall be in each case; and no court has any jurisdiction to overrule its discretion in these particulars. It is the settled law, however, that a municipality in the exercise of the power may not impose a license tax in a sum which is unreasonable and would amount to a prohibition of the continued engagement in a particular business. * * * "

Indulging the required presumption in favor of the ordinance, and viewing the ordinance in the light of the findings by the trial court, we cannot say that there has been a manifest abuse of discretion by the municipal authorities in enacting the ordinance or that the amount of the license tax is prohibitive.

The judgment in each case is due to be affirmed. So ordered.

Affirmed.

LIVINGSTON, C. J., and MERRILL and SPANN, JJ., concur.