**ELECTRIC BOND & SHARE CO. et al. v. SECURITIES AND EXCHANGE COMMISSION et al.***
No. 18.

Circuit Court of Appeals, Second Circuit.
Nov. 8, 1937.

*Writ of certiorari granted 58 S.Ct. 411, 82 L.Ed. ——.

Simpson Thacher & Bartlett, of New York City (Thomas D. Thacher and John F. MacLane, both of New York City, of counsel), for appellants.

Homer Cummings, Atty. Gen., Allen E. Throop, Gen. Counsel, of Washington, D. C., Securities & Exchange Commission, Robert H. Jackson, Asst. Atty. Gen., and Special Counsel, Securities & Exchange Commission, Benjamin · V. Cohen and Thomas G. Corcoran, Sp. Assts. to Atty. Gen. (John J. Abt, David Cobb, Joseph A. Fanelli, David Ginsburg, and Henry A.

Herman, all of Washington, D. C., and Frederick Bernays Wiener, of Providence, R. I., on the brief), for appellees.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge:

This appeal seeks a review of a decree which enjoins the appellants from violating section 4 (a), (1), (2), (3), (4) and (6) of the Public Utility Holding Company Act of 1935, hereafter referred to as the Act (15 U.S.C.A. § 79d (a) (1–4, 6), until they cease to be holding companies or register pursuant to section 5 of the Act (15 U.S.C.A. § 79e). The appellants have not registered and admit that they do the forbidden acts mentioned in section 4 (a), but argue that the Act and each section thereof violates the Federal Constitution in that the legislation was beyond the limited powers of Congress. A cross-bill, seeking an injunction against the enforcement of the provisions of the Act and its several sections, was filed, based upon the claim of the Act's unconstitutionality. Appellants invoke the Declaratory Judgment Act (Jud.Code § 274d, 28 U.S.C.A. § 400) in an effort to have each section of the statute declared invalid. Cross-defendants appeared and sought a dismissal of the cross-bill.

This suit is authorized by section 18 (f) of the Act (15 U.S.C.A. § 79r (f). Appellants American Gas & Electric Company, American Power & Light Company, National Power & Light Company, Electric Power & Light Company, and United Gas Corporation were subsidiaries of the Electric Bond & Share Company, which owned or controlled all their stock, and were the original defendants. Sixteen other holding companies in the bond and share system intervened. Seven of these, by the rule of the Commission were exempted from all duties and liabilities under the Act as holding companies, and two have ceased to be holding companies after acquiring all the properties of said subsidiaries. There remain as defendants, and now appellants, by intervention, the Power Securities Corporation, a subsidiary of Electric Power & Light Corporation; the Lehigh Power Securities Corporation, a subsidiary of the National Power & Light Corporation; the Utah Power & Light Company, a subsidiary of the Electric Power & Light Corporation; United Gas Public.

584

Service Company, a subsidiary of the United Gas Corporation; Houston Gulf Gas Company, a subsidiary of United Gas Public Service Company; the Nebraska Power Company, a subsidiary of the American Gas & Electric Company; and the Pacific Power & Light Company, a subsidiary of the American Gas & Electric Company. All but the first two of these are operating and holding companies. Cross-defendants named who are now appellees are government officials, the Attorney General and Postmaster General and members of the appellee Commission, who are to administer the enforcement of the Act.

A lengthy stipulation of facts has been agreed upon from which the court below made its findings.

The Act is entitled "Control of Public-Utility Holding Companies." It provides a series of regulations to be enforced by the Securities Exchange Commission "to meet the problems and eliminate the evils * * * connected with public-utility holding companies which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce." Section 1 (c) of the Act (15 U.S. C.A. § 79a (c). There are provided groups of regulations covering subjects such as: Registration (sections 4, 5 [15 U.S.C.A. §§ 79d, 79e]); issue and sale of securities (sections 6, 7 [15 U.S.C.A. §§ 79f, 79g]); acquisition of securities and utility assets (sections 8, 9, 10 [15 U.S.C.A. §§ 79h–79j]); corporate simplification and reorganization (section 11 [15 U.S.C.A. § 79k]); service contracts and other intercompany transactions (sections 12, 13 [15 U.S.C.A. §§ 79l, 79m]); and reports and accounts (sections 14, 15 [15 U.S.C.A. §§ 79n, 79o]). Other sections of the Act provide for the administration and enforcement of these regulatory provisions.

Congress found that a utility company is affected with a public interest, as is a company which controls and dominates a public utility company, and is subject to restraint and control for the public good. West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330; Nebbia v. New York, 291 U.S. 502,

54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469. And section 1 (15 U.S.C.A. § 79a) declares that such companies are affected with a national public interest when they build up and maintain control over operating companies by the use of the mails and channels of interstate commerce. Accordingly, Congress employed in this statute its authority to prevent the evils and abuses found by a report of the Federal Trade Commission (Report of Federal Trade Commission, U. S. Senate Document No. 92, part 73a, pp. 31–36, 41–58, 205–218) to exist in the use of the mails and the channels of interstate commerce. Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407; Ex parte Rapier, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93.

The Act is directed to the corporate and financial relationships and dealings between or affecting the holding company organized in one state and its subsidiaries which are not confined to that state. It is aimed at the holding company which controls operating utilities in states other than its domicile and which utilizes the channels of interstate commerce. The Commission is expressly directed to exempt a holding company and its subsidiaries from the provisions of the Act if the holding company system is predominantly intrastate in character and within the effective control of a single state (section 3 (a) (1) of the Act, 15 U.S.C.A. § 79c (a) (1). The kind of holding company which falls within the Act, it is said, "transcends state lines and is national in its scope and importance characteristics which * * * subject it to the control, of the commerce clause." Fisher's Blend Station, Inc. v. State Tax Commission, 297 U.S. 650, 655, 56 S.Ct. 608, 610, 80 L.Ed. 956.

The recitation of abuses contained in section 1 (b) of the Act (15 U.S.C.A. § 79a (b) and found to be fostered and perpetuated by the use of the national channels of commerce finds support in the report of the Federal Trade Commission to the Senate.[1] These findings point out that the unsound capitalization of holding companies operate to the detriment not only of widely scattered investors, but also to

---

[1] I.R. 393, 394; House Hearings on H.R. 5423, 74th Cong., 1st Sess., pp. 1129–1132. See, also, Federal Trade Commission reports for proof that interests of investors, consumers, and general public have been promoted by Bond and Share, American Gas and other defendants: F.T.C. Reports, Pt. 22, p. 636; Pts. 23 and 24, pp. 418, 419; Pt. 72-A, pp. 700–708, 832–840, 881; Pt. 84-A, p. 570. Report of the Federal Trade Commission to the U. S. Senate, 70th Congress, 1st Session, Senate Doc. No. 92, Part 72-A, p. 143.

the consumers of the utility products of the underlying operating companies. The Federal Trade Commission has found that holding companies have frequently been under pressure to squeeze the greatest possible revenue out of the operating companies and they have resisted voluntary rate reductions which might have strengthened those subsidiaries and increased the consumption of gas and electricity. The Federal Trade Commission report also found that they have sought unfair profits through a variety of intercompany transactions; that they have obstructed state regulations through their control of accounting practices and financial policies of their operating companies; and that they have frequently brought into common control widely distant utility facilities in disregard of economical management through the integration and co-ordination of related properties. Such holding companies have been found to be beyond the practical and legal power of the states.

Within section 2 (a) (7) of the Act (15 U.S.C.A. § 79b (a) (7), defining terms, a "holding company" is a company which actually controls operating companies and not a company which merely has an investment in an operating company. A "subsidiary company" is one (section 2 (a) (8) of the Act (15 U.S.C.A. § 79b (a) (8), which is actually controlled by a holding company. The duties imposed by the substantive provisions of the Act apply only to a holding company which is not entitled to exemption under section 3 (15 U.S.C.A. § 79c).

Section 4(a) of the Act (15 U.S.C.A. § 79d (a), provides that, where a holding company maintains its control over subsidiaries and carries on its business through federal channels of communication or of commerce, the controlling company must register under section 5 (15 U.S.C.A. § 79e). To meet the evils referred to in section 1 (15 U.S.C.A. § 79a), the Act (section 4 (a), 15 U.S.C.A. § 79d (a), requires utility holding companies to register with the Commission, if they transmit electric energy or gas in interstate commerce (section 4 (a) (1), 15 U.S.C.A. § 79d (a) (1); or if they use the mails or channels of interstate commerce to conduct certain types of transactions with their subsidiaries or other utility companies (section 4 (a) (2), 15 U.S.C.A. § 79d (a) (2), to market their securities (section 4 (a) (3), 15 U.S.C.A. § 79d (a) (3); to increase their hold-ings in their subsidiary companies or in other utility enterprises (section 4 (a) (4), 15 U.S.C.A. § 79d (a) (4); or if they otherwise engage in business in interstate commerce (section 4 (a) (5), 15 U.S.C.A. § 79d (a) (5); or if they engage in any of such interstate activities through the agency of a subsidiary company which they dominate and control (section 4 (a) (6), 15 U.S.C.A. § 79d (a) (6).

By registration is meant the filing of a notification as provided by section 5(a), 15 U.S.C.A. § 79e (a), and the company so registered is thereafter required to file with the Commission such pertinent information of the character described in section 5 (b), 15 U.S.C.A. § 79e (b), as the Commission may require. Section 4 (b), 15 U.S.C.A. § 79d (b), requires a holding company, which has publicly distributed, by means of the mails or interstate commerce, an issue of securities subsequent to January 1, 1925, to register under section 5 (15 U.S.C.A. § 79e), if such securities are still outstanding among investors in the several states. Section 5 provides for the filing by registered companies of registration statements containing information concerning their capitalization, business, and relations with subsidiaries. These registration provisions supplement and extend the informatory requirements of the Securities Act of 1933 (48 Stat. 74, as amended [15 U.S.C.A. § 77a et seq.]) and the Securities Exchange Act of 1934 (48 Stat. 881 [15 U.S.C.A. § 78a et seq.]).

Registered companies must file with the Commission pertinent information regarding new securities issued (sections 6, 7 of the Act (15 U.S.C.A. §§ 79f, 79g). New issues must be stopped by the Commission if they do not meet appropriate standards of fairness and honesty fixed by the Act (sections 6, 7). The acquisition of utility securities or assets by registered companies and their subsidiaries must be approved by the Commission as meeting certain standards specified in the Act (sections 9, 10 [15 U.S.C.A. §§ 79i, 79j]); registered companies cannot acquire properties which bear no relationship to the properties they already possess; they cannot burden themselves with new acquisitions at prices which bear no relation to the earning power of or the sums actually invested in the properties to be acquired. New acquisitions must be economically appropriate to and fit in with the major utility enterprise of the acquiring companies; they must

meet accounting requirements set by the commission (section 15 [15 U.S.C.A. § 79*o*]). Comprehensive regulations of the transactions between the companies within a holding company system and between such companies and interests affiliated with them and their dealings are controlled by sections 12 and 13 of the Act (15 U.S.C.A. §§ 79*l*, 79m). Abuses arising out of loans by subsidiaries to controlling holding companies are prohibited. The service, sales, and construction contracts by which holding companies have in the past obtained profits at the expense of the investor in the operating companies and its utility consumers are also regulated. The Act permits such intrasystem services to be performed for utilities under a holding company's control only at cost and subject only to such limitations as the Commission finds appropriate in the public interest and for the protection of investors and consumers. These are abuses pointed out in the Federal Trade Commission report to the Senate. Section 11 of the Act (15 U.S.C.A. § 79k) provides that as soon as practicable after January 1, 1938, the Commission shall, after notice and hearing, direct that every registered holding company which does not become a true investment company shall, within a specified period, confine its interest to a "single integrated public-utility system"; that they simplify their corporate structure and distribute voting power equitably among their security holders. The purpose of this section is said to be to confine holding companies to their functions in the operation of integrated properties, to end speculative ventures of high finance and forbid pyramiding structures and special mechanisms for disfranchising security holders of a voice in the management of their investments. All orders of the Commission can be made only after opportunity for a hearing (section 20 (c), of the act, 15 U.S.C.A. § 79t (c), and are subject to judicial review (section 24 [15 U.S.C.A. § 79x]).

Whether the registration provisions of the Act are constitutional depends upon the power of Congress to require a public utility holding company engaged in interstate commerce, either directly or through its subsidiaries, to file information regarded by the Congress as important in the public interest for the protection of investors and consumers.

The appellee argues that the federal power over interstate commerce and the mails is not limited to the protection of the channels of interstate commerce from danger of obstruction but extends to the prevention of their use for a purpose or in a manner contrary to sound public policy. Appellee also contends that the federal power over interstate commerce and the mails is not abridged because the use of such channels of intercourse is incidental or is not the major activity of the user.

 Congress has long exercised, and the courts have sustained, the federal power to prevent the facilities of interstate commerce and the mails from being used to accomplish ends inimical to the general welfare. This legislation is concerned with the power of the federal government to control in the public interest the flow of commerce and intercourse through these channels; but not to the extent that the government may impose a collateral obligation upon the person responsible for the flow. The latter question depends upon the particular relationship of the obligation to, and its influence upon, that flow. Carter v. Carter Coal Co., 298 U.S. 238, 56 S. Ct. 855, 80 L.Ed. 1160; Board of Trade, etc., v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; United States v. Ferger, 250 U.S. 199, 39 S.Ct. 445, 63 L.Ed. 936. Such questions may arise when the validity of other portions of the Act is presented to a court, but are not here involved in the consideration of the registration provisions because these sections are directly confined to certain regulations of the use of the channels of interstate commerce and the use of the mail facilities. No holding company need register unless it makes specified uses of the mails and instrumentalities of interstate commerce. A holding company whose interests and business are predominantly intrastate need not register even though it makes use of the mails and the channels of interstate commerce.

 Congress has, within the scope of the powers delegated to it by the Constitution, the same full power in its domain that the States enjoy in their domain to employ such regulatory devices as are deemed reasonably adapted to the public welfare. Hamilton v. Ky. Distilleries Co., 251 U.S. 146, 156, 40 S.Ct. 106, 108, 64 L.Ed. 194. It has been referred to as "police power, for the benefit of the public, within the field of interstate commerce." Brooks v. United States, 267 U.S. 432, 436, 45 S.Ct. 345,

346, 69 L.Ed. 699, 37 A.L.R. 1407. "We have frequently said that in the exercise of its control over interstate commerce, the means employed by the Congress may have the quality of police regulations." Kentucky Whip & Collar Co. v. I. C. Ry. Co., 299 U.S. 334, 346, 57 S.Ct. 277, 280, 81 L.Ed. 270. This police power under the commerce clause was fully considered in the Lottery Case (Champion v. Ames), 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492, and it was decided that lottery tickets are subjects of interstate commerce contrary to the argument that the prohibition or permission of lotteries was a matter reserved to the states by the Tenth Amendment. Congress can prohibit the interstate transportation of livestock known to be infected with a contagious disease (Missouri, K. & T. Ry. v. Haber, 169 U.S. 613, 18 S.Ct. 488, 42 L.Ed. 878; Reid v. Colorado, 187 U.S. 137, 23 S. Ct. 92, 47 L.Ed. 108); provide requirements for inspection and dipping of cattle which are likely to range across state lines (Thornton v. United States, 271 U.S. 414, 46 S.Ct. 585, 70 L.Ed. 1013); make it unlawful to ship in interstate commerce foods and drugs unless they are unadulterated and properly labeled (Pittsburgh Melting Co. v. Totten, 248 U.S. 1, 39 S.Ct. 3, 63 L.Ed. 97; Weeks v. United States, 245 U.S. 618, 38 S.Ct. 219, 62 L.Ed. 513; McDermott v. Wisconsin, 228 U.S. 115, 128, 33 S. Ct. 431, 57 L.Ed. 754, 47 L.R.A.(N.S.) 984, Ann.Cas.1915A, 39). The White Slave Traffic Act (36 Stat. 825 [18 U.S.C.A. § 397 et seq.]) was sustained even where no commercial vice was involved. Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann. Cas.1917B, 1168. So, too, the National Motor Vehicle Theft Act (41 Stat. 324 [18 U.S.C.A. § 408]), punishing the interstate transportation of stolen motorcars (Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407); also the regulation and transportation of prison-made goods (Whitfield v. Ohio, 297 U.S. 431, 56 S.Ct. 532, 80 L.Ed. 778). As said by the Supreme Court:

"Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty or the spread of any evil or harm to the people of other states from the state of origin." Brooks v. United States, 267 U.S. 432, 436, 45 S.Ct. 345, 346, 69 L.Ed. 699, 37 A.L.R. 1407.

Nor is the police power within the field of interstate commerce limited to prohibiting the transportation of articles that are themselves harmful. The stolen motorcar involved in the Brooks Case was not in itself different from an automobile lawfully acquired. There was nothing harmful or immoral about prison-made goods, governed by the Hawes-Cooper Act (49 U.S. C.A. § 60), involved in Whitfield v. Ohio, supra, or in the oil regulated by the Connally Act, 15 U.S.C.A. § 715 et seq. Griswold v. President, etc., 82 F.(2d) 922 (C.C. A.5). In each of these statutes, as in the registration provisions of this Act, it was held, Congress conditioned particular uses of the channels of interstate commerce upon certain safeguards to prevent those uses from being made the instruments of causing evil or harm in a state other than the state of origin, even though the articles or communications transported might not be inherently harmful. The use of the channels of interstate commerce, regulated by Congress, has been an essentially business or commercial use. The courts have never regarded the innocence or harmfulness of the mere physical movement of persons, goods, or communications as determinative of the limits of congressional power, so long as the activities regulated were genuinely honest in character. The Securities Act of 1933 and the Securities Exchange Act of 1934 make it unlawful to use the mails or channels of interstate commerce without complying with regulations prescribed by the Commission in respect of certain transactions in securities. We held this a valid exercise of Congressional power. Jones v. Securities & Exchange Comm., 79 F.(2d) 617 (C. C.A.2), reversed in 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015, on other grounds; Coplin v. United States, 88 F.(2d) 652 (C. C.A.9); Securities and Exchange Comm. v. Torr, 15 F.Supp. 315 (D.C.S.D.N.Y.) reversed, 87 F.(2d) 446 (C.C.A.2), on other grounds.

In Kentucky Whip & Collar Co. v. I. C. Ry. Co., 299 U.S. 334, 347, 57 S.Ct. 277, 281, 81 L.Ed. 270, the court said: "And, while the power to regulate interstate commerce resides in the Congress, which must determine its own policy, the Congress may shape that policy in the light of the fact that the transportation in interstate commerce, if permitted, would aid in the frustration of valid state laws for the protection of persons and property."

■ Even when regulating activities not in interstate commerce but which directly affect such commerce, the federal power may be exercised to control innocent as well as harmful transactions so as to insure that the innocent shall not be perverted into the pernicious. Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229.

■ Congress cannot, of course, exercise the commerce and mail powers to meet evils which are not spread or perpetuated by the use of the channels of interstate commerce or the mails. Hamner v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724.

■ The power of Congress over the mails is not limited to the protection of facilities of the mails. It may be exercised to prevent the use of the mails for purposes which it deems objectionable to sound public policy. This power probably may be regarded as even more comprehensive than that exercised over interstate commerce, for the government's interest in the mails is proprietary as well as regulatory. Stephenson v. Binford, 287 U.S. 251, 53 S.Ct. 181, 77 L.Ed. 288, 87 A.L.R. 721; Ellis v. United States, 206 U.S. 246, 27 S.Ct. 600, 51 L.Ed. 1047, 11 Ann.Cas. 589; cf. Atkin v. Kansas, 191 U.S. 207, 24 S.Ct. 124, 48 L.Ed. 148.

The use of the mails has been denied to those engaged in a fraudulent scheme (Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092; Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877); it has been denied for mailing obscene matters (Grimm v. United States, 156 U.S. 604, 15 S.Ct. 470, 39 L.Ed. 550); Congress may cause newspapers or periodicals to make regular statements of ownership and extent of their circulation for the use of the mails (Lewis Pub. Co. v. Morgan, 229 U.S. 288, 33 S. Ct. 867, 57 L.Ed. 1190); "it must be left to congress, in the exercise of a sound discretion, to determine in what manner it will exercise the power it undoubtedly possesses" (In re Rapier, 143 U.S. 110, 134, 12 S.Ct. 374, 36 L.Ed. 93).

In considering the particular provisions of section 4 (a) of the Act (15 U.S.C. A. § 79d (a), and the nature of the transactions there subjected to regulation, it becomes evident that the evils which the Congress sought to meet are made possible and are spread by the use of the federal channels of commerce. In respect of the sale of securities, the harm reached by the Act is to investors.

■ Holding companies are not immune from federal statutes regarding the use of the mails and instrumentalities of interstate commerce merely because some or even a major part of their activities or the activities of their local subsidiary operating companies may be intrastate. No constitutional doctrine limits the federal power over the mails and channels of commerce to the enactment of statutes which apply only to persons whose principal business is carried on in interstate commerce or by the use of the mails.

■ Section 4(a) (1) of the Act, 15 U. S.C.A. § 79d(a) (1), provides that it shall be unlawful for nonregistered holding companies "to sell, transport, transmit, or distribute, or own or operate any utility assets for the transportation, transmission, or distribution of, natural or manufactured gas or electric energy in interstate commerce." Congress has paramount authority to regulate the transmission or sale for transmission of gas and electric energy across state borders. Utah Power & Light Co. v. Pfost, 286 U.S. 165, 182, 52 S.Ct. 548, 552, 76 L.Ed. 1038; Pennsylvania Gas Co. v. P. S. C., 252 U.S. 23, 29, 40 S.Ct. 279, 281, 64 L.Ed. 434. A sale of gas or electric energy is a sale in interstate commerce whether title passes at the state border (People's Natural Gas Co. v. P. S. C., 270 U.S. 550, 46 S.Ct. 371, 70 L.Ed. 726) or in the state of destination (State Tax Comm. v. Interstate Natural Gas Co., 284 U.S. 41, 52 S.Ct. 62, 76 L.Ed. 156). From the stipulation it is clear that the appellants were engaged in interstate commerce in their transmission and sale across state lines of electric energy and gas, and congressional regulation of such interstate business is in no way dependent upon the relative amounts of interstate or intrastate business done. Public Utilities Comm. v. Attleboro Steam & Elec. Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549. So, too, the power of Congress cannot be circumvented by the creation of a corporation which, while not technically itself in interstate commerce, controls the instruments of that commerce. Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679. The federal government need not suffer the continuance or permit the development of financial superstructures upon instrumentalities of

interstate commerce which impair, or tend to impair, their credit or their effectiveness to serve both the investing and consuming public. Cf. New York Central Securities Corp. v. United States, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138; Federal Trade Comm. v. Western Meat Co., 272 U. S. 554, 47 S.Ct. 175, 71 L.Ed. 405. Therefore, if a holding company obstructs the conduct of interstate commerce in contravention of policies which Congress deems vital to the public interest, the offense is not mitigated by a showing that it also obstructs a larger amount of intrastate commerce. This registration requirement involves only the right of the government to demand that a holding company which itself, or through a subsidiary company under it, controls, sells, or transmits electric energy or gas in interstate commerce, shall inform the Commission of its activities and its interests.

■ By section 4(a) (2) of the Act, 15 U. S.C.A. § 79d(a) (2), after December 1, 1935, a nonregistered utility company may not lawfully use the mails or instrumentalities of interstate commerce "to negotiate, enter into, or take any step in the performance of, any service, sales, or construction contract undertaking to perform services or construction work for, or sell goods to, any public-utility company or holding company." This requires holding companies whose activities are not confined to a single state to register if they use the mails or channels of interstate commerce to make or perform services, sales or construction contracts with either operating or holding companies. Undoubtedly service fees paid by local utilities are charged to operating costs by the utilities and are reflected as they should be, when legitimate and commensurate with the services rendered, in the rates charged to the public. Construction fees are charged either to maintenance or capital account and are reflected in the base rate or in operating costs. When the holding company dictates the terms upon which it will perform these services for its own operating companies, the latter has neither the power nor the incentive to seek the services of a possible lower bidder. The discussions in Congress [2] show its intent on this subject. Moreover, the Federal Trade Commission in its investigation found that the national public interest may be adverse-

ly affected when holding companies and their subsidiaries enter into these service contracts in the absence of arm's length bargaining and without the restraint of independent competition. The suggestion that the power of the federal government over interstate commerce is limited to the regulation of trade in or the movement of tangible commodities which are the subject of barter and sale has been repudiated. Associated Press v. N. L. R. B., 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953; International Text-Book Co. v. Pigg, 217 U.S. 91, 107, 30 S.Ct. 481, 54 L.Ed. 678, 27 L.R.A.(N.S.) 493, 18 Ann.Cas. 1103; International Text-Book Co. v. Peterson, 218 U.S. 664, 31 S.Ct. 225, 54 L.Ed. 1201.

There has been formed for such service the Ebasco and American Gas for the subsidiary companies of the Electric Bond and Share, and these are not any the less engaged in interstate commerce than the corresponding courses of instruction conducted by the International Text Book Company or the Clearing House of News conducted by the Associated Press.

■ But, like the other evils or misuses pointed out in the mail fraud and prison goods cases, Congress may not have the power to eradicate these evils, but it does have the power to stop the spread of such evils through the channels of commerce which are subject to its control. Scrutiny and probing of intercorporate relationships in the utility field are not beyond the legitimate powers of government acting within its designated jurisdiction. Since Congress was satisfied from reports to it that by performance of these services for utility holding companies the federal channels of commerce had been abused by improvident contracts, there is no authority which denies the federal power specifically to provide that the future channels of intercourse should not be utilized in any manner detrimental to the public generally. The primary purpose of this regulatory enactment is not to punish abuse but to prevent its occurrence. Registration therefore becomes a protective requirement.

■ By section 4(a) (3) of the Act, 15 U. S.C.A. § 79d(a) (3), a nonregistered utility holding company may not distribute or make any public offering for sale or exchange of any security of such holding company or affiliate of such holding com-

[2] Hearings before the Committee on Interstate Commerce, U. S. Senate, 74th Congress, First Session on Senate 1725, 868.

pany, any public utility company, or any holding company, by the use of the mails or any means of instrumentality of interstate commerce, or to sell any such security having reason to believe that such security, by the use of the mails or any means of instrumentality of interstate commerce, will be distributed or made the subject of a public offering. Registration will make available to the Commission pertinent information regarding the business and activities before making a public offering through the channels of interstate commerce of the holding company's own securities or those of any of its subsidiaries. Unregulated public distribution of securities by utility holding companies through the mails and channels of interstate commerce has been found to cause widespread disaster to investors throughout the country. Excessive capitalization represented by such securities has been an obstacle to rate reductions. Holding companies have offered to the public not only their own securities but those of their subsidiaries, and such public holding companies' securities are the very essence of the holding companies' business, as the court below found.

If Congress has the power to compel a holding company to register when it makes a public offering of securities through the mail or interstate channels, it also has the power to compel a holding company to register if it sells a security having reason to believe that such security by the use of the mails or other means or instrumentality of interstate commerce will be distributed or made the subject of a public offering. The registration requirements here are similar to the requirements for registration of securities under the Securities Act of 1933 as amended in 1934 (15 U.S.C.A. § 77a et seq.).

By section 4(a) (4) of the Act, 15 U.S.C.A. § 79d(a) (4), a nonregistered company is forbidden the use of the mails or any instrumentality of interstate commerce, to acquire or negotiate for the acquisition of any security or utility assets of any subsidiary company or affiliate of such holding company, any public utility company, or any holding company. Acquisition of utility securities and assets forms the basis of utility holding company finance. The proceeds of public offerings are used to finance these companies. Dangerous securities flow from unsound and unwise ac-

quisitions. In this connection, such acquisitions result in write-ups which lead to the issuance of securities upon the basis of fictitious and unsound asset values having no fair relation to the sums invested or the earning capacity of the properties. It is by this section intended to regulate such evils. Effective security regulation becomes impossible when the acquisitions to be financed have already been consummated. To acquire and hold together under common control various utility properties and securities is one of the very reasons for a holding company's existence. This purpose is possible and can be financed only if the holding company is able to issue and sell through the mails and in interstate commerce its own securities to the public, thereby securing the funds with which to acquire the properties. When they can acquire utility assets and securities at prices extravagantly higher than those justified by the earning capacity of the acquired properties, the holding company's own securities cannot be sound and the investors are injured. So, too, the interests of the consumers are at stake. Unsound acquisitions on the part of a holding company are detrimental to the industry. The need of regulation of such activities has been found to exist by Congress and it is within the power of Congress to regulate these channels to guard against and expose financial abuses which bring ruination to many.

By section 4(a) (6) of the Act, 15 U.S.C.A. § 79d(a) (6), an unregistered holding company may not lawfully own, control, or hold with power to vote, any security of any subsidiary company thereof that does any of the acts enumerated in paragraphs 1 to 5, inclusive, of this subsection, 15 U.S.C.A. § 79d (a) (1–5). A 10 per cent. stock ownership creates a presumption of control. The act provides (section 2 (a) (8), 15 U.S.C.A. § 79b (a) (8), that the Commission upon application shall declare a company not to be a subsidiary company if it finds that it in fact is not controlled by the holding company. By section 2 (a) (7), 15 U.S.C.A. § 79b (a) (7), any company that is prima facie a holding company under the act can rebut the presumption by showing that in fact it does not control subsidiary utility companies. The presumption provided for is neither arbitrary nor unreasonable as Congress could find upon the report of

the Federal Trade Commission.[3] Practical control is often exercised and retained, through the ownership by those who are already in managerial control of a substantial minority of the voting power. The majority stock is not necessary for control. United States v. Union Pac. Ry. Co., 226 U.S. 61, 95, 96, 33 S.Ct. 53, 57 L. Ed. 124.

By section 4(a) (6) of the Act, 15 U. S.C.A. § 79d (a) (6), Congress has not attempted to disregard the corporate entity of any corporation. The provisions of the Act which regulate the relations between the holding company and its subsidiary take into full account the existence, separation, and protection of such entities. Congress has found that in certain situations the proper regulation of interstate commerce and postal activities of the subsidiary requires the regulation of the controlling company. "It is with the system that the law must deal, not with its elements." Southern Pac. Terminal Co. v. I. C. C., 219 U.S. 498, 523, 31 S.Ct. 279, 286, 55 L.Ed. 310.

Congress has heretofore attempted to meet the evils of the holding company's device by appropriate legislation. The Emergency Railroad Transportation Act 1933 (48 Stat. 217, § 202, 49 U.S.C.A. § 5 (4–17) provides for the regulation of railroad holding companies; the Banking Act of 1933 (48 Stat. 186, § 19, as amended, 12 U.S.C.A. § 61) provides for extensive regulation of bank holding companies. The validity of these regulations depends upon the effect which a holding company has upon its subsidiary companies and acts of its subsidiary companies which are themselves within the scope of the Congressional power. United States v. Reading Co., 226 U.S. 324, 33 S.Ct. 90, 57 L.Ed. 243; Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L. Ed. 679. These powers cannot be defeated by legal subterfuges. So section 4 (a) (6) of the Act, 15 U.S.C.A. § 79d (a) (6), is necessary to deal with economic actualities and to prevent the circumvention of the will of Congress within its appointed sphere of control over interstate commerce. Northern Securities Co. v. United States, supra.

Appellants contend that the registration provisions of the Act violate the due process clause of the Fifth Amendment.

Holding companies' managements of necessity have dual and often inconsistent obligations toward their own and their subsidiaries' security holders. Such legislation covering holding companies in the banking field and the railroad field has been pointed out. Taxation heavy enough to discourage or break up multiplication of units under common corporate control has been sustained. Fox v. Standard Oil of N. J., 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780. Holding companies controlling electric and gas companies which are local monopolies not subject to the normal restraints of competition may readily and reasonably be distinguished from other holding companies. But a distinction in legislation is not arbitrary "if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S. Ct. 337, 340, 55 L.Ed. 369, Ann.Cas.1912C, 160. It is unnecessary that the legislative authority exerted in the proper field embrace all the evils within its reach. The Constitution permits cautious advance, step by step, in dealing with the evils which are exhibited in the activities within the range of the legislative power. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 11, 46, 57 S.Ct. 615, 617, 628, 81 L.Ed. 893, 108 A.L.R. 1352.

The contention regarding denial of due process in registration provisions rests upon the claim that some of the exemptions for holding companies provided in section 3 (a) of the Act, 15 U.S.C.A. § 79c (a), are arbitrary. But, as we have pointed out, each exemption has a very real and practical basis and evidences the desire of Congress not to exert its power over the mails and channels of interstate commerce beyond what seems to be essential in the national public interest.

It is also contended that the registration provisions involve an unconstitutional delegation of power. It is suggested that the power given the Commission under section 2 (a) (7) of the Act, 15 U.S.C.A. § 79b (a) (7), to relieve a holding company from a prima facie presumption of control which springs from a specified percentage of stock ownership, is an unconstitutional delegation of power. The provision directs the Commission, after a notice and hearing, to

[3] 70th Congress, First Session, Senate Document 92, par. 72-a, p. 143.

declare a company not to be a holding company if it finds that it does not exercise such control or controlling influence over operating utility companies as to make it necessary to be treated as a holding company or controlling company in order to protect the public or investors or consumers from the evils at which the Act is directed. Congress found it impracticable to put upon the Commission the burden of making a specific determination of control for each and every holding company before that company could be deemed a holding company and required to register. Congress elected the element of stock ownership, a factor most usually indicative of control, as prima facie evidence of control. The burden of proof, which is cast upon the utility company to prove otherwise, is not onerous. Judicial review is provided to guard against any arbitrary action on the part of the Commission and to afford a remedy should the Commission's finding be not supported by substantial evidence. Section 24 (a) of the act, 15 U.S.C.A. § 79x (a).

■ Congress has promulgated a series of laws regulating the financial activities of utility holding companies within the scope of the federal power to assure their being conducted in accordance with definite standards prescribed by it. To facilitate the application of these standards, Congress has directed their administration by an administrative commission. The standards of the Act are sufficiently specific and definite and should be upheld. New York Central Securities Corp. v. United States, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138; Federal Radio Comm. v. Nelson Bros. Bond & Mtg. Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166.

■ The registration provisions of this Act are separable from the remainder of the Act. There is a presumption of separability raised by section 32 of the act, 15 U.S.C.A. § 79z—6. Although section 32 is not a command by Congress that valid fragments must be preserved if the warp and woof are torn away, Dorchy v. Kansas, 264 U.S. 286, 290, 44 S.Ct. 323, 324, 68 L.Ed. 686, yet it creates a presumption that the Congress would have been satisfied with what remained if parts were invalid. Carter v. Carter Coal Co., 298 U.S. 238, 334, 56 S. Ct. 855, 883, 80 L.Ed. 1160; Champlain Refining Co. v. Corporation Comm., 286 U.S. 210, 235, 52 S.Ct. 559, 564, 76 L.Ed. 1062, 86 A.L.R. 403. The provisions of the Act

designed for control by informatory methods constitutes a functional integrated whole which is susceptible of enforcement without regard to any other sections of the Act and there is no reason inherent in the statute itself why the registration provisions cannot be applied standing alone. Therefore, we hold section 4 (a) and section 5 of the act, 15 U.S.C.A. §§ 79d (a), 79e, to be constitutional and separable.

The cross-bill of necessity is closely connected with the consideration of the separability question. Holding, as we do, that the registration provisions are separable from the control provisions, the cross-bill was properly dismissed. The cross-bill seeks an adjudication on all sections of the act applicable only to registered holding companies, and the appellants have not registered. Such an adjudication would amount to an advisory opinion on a mythical state of facts.

■ The cross-bill seeks first an injunction restraining the enforcement of the Act, and, second, a declaratory judgment that it is void and unconstitutional in its entirety. The cross-bill is concerned only with the provisions of the Act which deal with registered holding companies since the bill and answer provide ample opportunity to decide the issues presented by section 4 (a) and section 5, the registration sections. As appellants have not registered, the cross-bill seeks an advisory opinion as to their rights and duties under the Act if and when they register. This merely poses a variety of hypothetical controversies which might arise if the appellants would give up their status as nonregistered holding companies, and if, thereafter, they so conduct their affairs as to come into contact with one or more provisions of the act and if the appellees thereafter should attempt to enforce such provision or provisions of the Act against them. Until they actually become registered companies and until they contemplate a particular course of conduct which is proscribed by the provisions of the Act applicable to them, the appellants can present no controversy to the court on any provision of the act. No matter what their grievance against Congress may be, the appellants have no controversy with the Commission or any individual cross-defendant over these provisions of the statute which deal with registered companies.

There is no actual controversy presented such as is required by the Declaratory Judgment Act (Jud.Code § 274d, 28 U.S.

C.A. § 400), and it does not apply. Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000; Ashwander v. Tenn. Valley Asso., 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688; United States v. W. Va., 295 U.S. 463, 475, 55 S.Ct. 789, 793, 79 L.Ed. 1546.

The appellants have no right to an injunction since they show no threats to enforce the provisions of the Act dealing with registered companies. Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322; Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078; Ex parte LaPrade, 289 U.S. 444, 53 S.Ct. 682, 77 L.Ed. 1311.

Mere allegations of irreparable injury will not suffice to warrant an injunction. Facts must appear on which the allegation is predicated in order that the court may be satisfied of the nature of the injury. Argumentative allegations or inferences from facts are insufficient. Milliken v. Stone, 16 F.(2d) 981, 984 (C.C.A.2).

Decree affirmed.

L. HAND, Circuit Judge, concurring in opinion.

SWAN, Circuit Judge, concurring in result.

L. HAND, Circuit Judge (concurring).

It seems to me doubtful whether sections 4 and 5 of the act (15 U.S.C.A. §§ 79d, 79e) could stand alone if all the rest of the statute were stripped away; I do not say that they could not, but I prefer what seems to me a safer ground on which to affirm the decree. Sections 6 and 7 (15 U.S.C.A. §§ 79f, 79g) lay out a system of control over the issuance and sale of securities; sections 9 and 10 (15 U.S.C.A. §§ 79i, 79j), over their acquisition. I am by no means sure that all parts of these sections are valid; for example, those which forbid the use of other means ("or otherwise"), than the mails and interstate commerce; again, some of the regulatory discretions vested in the Commission. But when all these doubtful provisions are deleted, a workable system of controls would still be left, which section 5 would implement. Section 4 is not merely a sanction in terrorem, to procure obedience to this system; the controls may be read as conditions upon the exercise of the activities which the section specifies. This is plainly true as to subdivisions 3 and 4; and

the relation between the controls of sections 6, 7, 9 and 10 and subdivision 1 is direct enough. The securities issued or acquired by a holding company or a subsidiary which it controls, may certainly have an effect upon the service rendered, and especially upon the rates. Indeed, it is held in many quarters that an effective regulation of rates is impossible without some control over the issuance and acquisition of securities. The relation between those activities and "servicing contracts" proscribed by subdivision 2 is indeed less direct; undoubtedly the subdivision relates principally to section 13 (15 U.S.C.A. § 79m), but it seems to me that there is more than a fanciful relation between the credit of a company—as represented by its securities held or issued—and the services which it renders to another utility company. The pressure to exact exorbitant terms will depend in some measure upon that credit; so too its ability to perform and the character of the performance. Therefore even though section 13 were void, which I do not suggest, I should say that subdivision 2 might stand.