THE GRAND UNION COMPANY, A DELAWARE CORPORATION, *ET AL.*, PLAINTIFFS-APPELLANTS, v. ARTHUR J. SILLS, ATTORNEY GENERAL OF NEW JERSEY, AND WILLIAM HOWE DAVIS, DIRECTOR, ETC., DEFENDANTS-RESPONDENTS, AND HERMAN ADES, PHILIP SOSNI, *ET AL.*, INTERVENERS-DEFENDANTS-RESPONDENTS.

Argued September 21, 1964—Decided November 16, 1964.

*Mr. Stephen B. Wiley* argued the cause for plaintiffs-appellants (*Messrs. Meyner & Wiley,* attorneys; *Mr. Edwin C. Landis, Jr.* and *Mr. G. Douglas Hofe, Jr.,* on the brief).

*Mr. David J. Goldberg,* Deputy Attorney General, argued the cause for defendants-respondents (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

*Mr. Harold H. Fisher* argued the cause for interveners-defendants-respondents, Herman Ades, *et als.* (*Messrs. Shanley & Fisher,* attorneys; *Mr. John Kandravy,* on the brief).

*Mr. Grover C. Richman, Jr.* argued the cause for interveners-defendants-respondents Philip Sosni, *et al.* (*Messrs. Richman, Berry & Ferren,* attorneys; *Mr. Robert W. Page,* on the brief).

The opinion of the court was delivered by

JACOBS, J. The Law Division of the Superior Court upheld the constitutionality of *Chapter* 152 of the *Laws of* 1962, *N. J. S. A.* 33 :1–12.31 *et seq.* which is designed to limit retail liquor licenses to two per person without, however, disturbing present multiple holdings. *Grand Union Co. v. Sills,* 81 *N. J. Super.* 65 (1963). An appeal was taken to the Appellate Division and while it was pending there we certified it. *R. R.* 1 :10.

The plaintiffs are corporations and individuals who have interests in establishments which hold annual licenses authorizing the retail sale of alcoholic beverages. After the passage of *Chapter* 152 they filed a complaint seeking a declaration of unconstitutionality on various grounds. They attacked the legislation as being "without justification in any observable public purpose" and as having been enacted "only for the economic enhancement of private competitive interests." And they complained about ambiguities and uncertainties in the legislative terminology and arbitrary and discriminatory consequences. *Grand Union Co. v. Sills, supra,* 81 *N. J. Super.,* at *pp.* 72–74. In support of their basic attack the plaintiffs tendered expert testimony bearing on the probable economic effects of the legislation, and evidence bearing on the identities of the private organizations which sponsored the enactment.

Professor Markham of Princeton University and Professor Baldwin of Dartmouth College were engaged by the plaintiffs to make a study of New Jersey's alcoholic beverage industry and the impact of *Chapter* 152. While their general qualifications as economists were undisputed they admittedly had not made any previous studies and had not had any previous experience in the alcoholic beverage field. Their report expressed the view that the legislation would curtail the growth of a group of retailers which has "served the public interest well by their promotion of private brands selling at far lower retail prices than national brands of comparable quality." They acknowledged that they were concerned with the eco-

nomic impact of the legislation and not with its "sociological or psychological" aspects and that their study did not encompass any examination of experiences in other states where comparable legislation has been in effect.

Professor Baldwin testified that he considered it to be in the public interest to sell liquor for lower prices and he voiced disapproval of a former New Jersey Commissioner's view that "price competition was not desirable in the field of liquor and that because of special characteristics of the industry, normal free enterprise was not appropriate in this area." Later in his testimony Professor Baldwin pointed out that his earlier statement in support of price competition in the liquor field was conditioned upon the belief "that the total consumption is not particularly responsive to price." Still later he acknowledged that when dealing with liquor sales in chain supermarkets there was the likelihood that the housewife would increase her purchases of liquor although he viewed her purchases as probably related to what is "socially an acceptable type of drinking."

Professor Markham voiced the same thought with respect to increased purchases by housewives. He said he was not quite sure that the large chain store's sales of its private labels at one-third less "would induce any greater consumption" than the sales of the higher priced national brands by the small retailers. He was of the opinion that *Chapter* 152 would tend to restrict price reductions in the sale of liquor, would tend to curtail local advertising by the group of retailers which is economically most capable of engaging in such advertising, and would curb the growth of the chain store operation in the liquor field. He acknowledged that since, almost everywhere within the State, the maximum number of allowable licenses has already been issued, any significant increase in chain liquor stores would necessitate the purchase of outstanding licenses and the displacement of individual retail operators.

The plaintiffs' evidence as to the sponsorship of the enactment consisted of excerpts from periodicals and news-

papers. These indicated that organizations of liquor dealers, particularly retail liquor dealers, supported and solicited support of the enactment as anti-monopoly legislation which would curb chain store liquor operations and aid small liquor dealers. There were no legislative committee reports and no reports of legislative debates. Although the plaintiffs sought to introduce the oral testimony of a single legislator, this testimony was properly excluded by the trial court. See *Two Guys from Harrison, Inc. v. Furman*, 32 *N. J.* 199, 226–228 (1960); 2 *Sutherland, Statutory Construction* § 5013, at *p.* 504 (*3d ed.* 1943). When Governor Hughes signed the bill into law, he issued a formal statement which referred to the exceptional nature of the liquor industry and the great need for its rigid control and noted that "to the extent that free enterprise, in its full theoretical sense, collides with effective alcoholic beverage control, it manifestly must yield to the public welfare."

██ In the Law Division, Judge Lyons found that the plaintiffs' testimony fell far short of demonstrating that the statute did not embody a lawful use of the police power to attain a proper public purpose. He noted that the professors had confined their testimony to economic considerations thereby excluding other factors which are specially applicable in the field of liquor control; and he explicitly disagreed with their view that liquor consumption is not likely to be affected by price stimulations. *Grand Union Co. v. Sills, supra,* 81 *N. J. Super.*, at *p.* 72. He pointed out that the legislation was entitled to the various presumptions of constitutionality which attend on judicial review of statutory enactments (*Hudson County News Co. v. Sills*, 41 *N. J.* 220, 227 (1963), appeal dismissed, 378 *U. S.* 583, 84 *S. Ct.* 1914, 12 *L. Ed. 2d* 1036 (1964); *Fried v. Kervick*, 34 *N. J.* 68, 74 (1961)) and to aid from the doctrine that factual support for the legislative judgment would be presumed, and absent a sufficient showing to the contrary, the court would assume that the enactment rested "upon some rational basis within the knowledge and experience of the Legislature." *Reingold v. Harper*, 6 *N. J.*

182, 196 (1951); *Hudson County News Co. v. Sills, supra,* 41 *N. J.,* at *p.* 228; *United States v. Carolene Products Co.,* 304 *U. S.* 144, 152, 58 *S. Ct.* 778, 82 *L. Ed.* 1234, 1241 (1937). Finally, he stressed that *Chapter* 152 was legislation aimed at liquor and not at essential commodities such as food and clothing; in sharp contrast to liquor, those commodities are sold freely and society's interest is in stimulating rather than in retarding their sale.

██ Because of its inherent evils, liquor has always been dealt with as a subject apart. *Borough of Fanwood v. Rocco,* 33 *N. J.* 404, 411 (1960); *Hudson Bergen County Retail Liquor Stores, Ass'n v. Board of Com'rs of City of Hoboken,* 135 *N. J. L.* 502, 506 (*E. & A.* 1947); *Paul v. Gloucester County,* 50 *N. J. L.* 585, 595 (*E. & A.* 1888). Its sale may be prohibited entirely or permitted under severe restrictions. *Borough of Fanwood v. Rocco, supra,* 33 *N. J.,* at *p.* 411; *Bumball v. Burnett,* 115 *N. J. L.* 254, 255 (*Sup. Ct.* 1935); *Ziffrin, Inc. v. Reeves,* 308 *U. S.* 132, 138, 60 *S. Ct.* 163, 84 *L. Ed.* 128, 135 (1939). In colonial days there were laws licensing and restricting the sale of liquor and, after the revolution, there were comparable enactments which, though revised from time to time, always gave clear recognition to the dangers and the need for controls. *Allinson, Acts of The General Assembly* 1702–1776, *c.* 158, *pp.* 102–107; *Paterson Laws of New Jersey* 1800, *pp.* 235–240; *Statutes of New Jersey* (1847 *Rev.*), *c.* 10, *pp.* 576–589; *Paul v. Gloucester County, supra,* 50 *N. J. L.,* at *p.* 596; *Meehan v. Board of Excise Commissioners,* 73 *N. J. L.* 382, 383 (*Sup. Ct.* 1906), aff'd, 75 *N. J. L.* 557 (*E. & A.* 1908); *Hudson Bergen County Retail Liquor Stores Ass'n v. Board of Com'rs of City of Hoboken, supra,* 135 *N. J. L.,* at *p.* 507. See Byse, "Alcoholic Beverage Control Before Repeal," 7 *Law & Contemp. Prob.* 544 (1940).

Despite the licensing restrictions, abuses in the liquor industry prevailed during the nineteenth century and early twentieth century, and gave rise to much public concern. The tied house system (30 *Am. Jur. Intoxicating Liquors* § 38, at *p.*

551 (1958)) contributed to sales stimulations which ran counter to the goal of temperance, and relations between liquor and legislative interests were oftentimes unholy in nature. In 1844 the territorial legislature of Oregon adopted a prohibition law and its action was followed by similar enactments in many states, not, however, including New Jersey. In 1919 a national policy of prohibition became effective through the adoption of the eighteenth amendment and sales of alcoholic beverages became unlawful in our State as well as elsewhere. The unfortunate experiences of the prohibition era need not be recounted here; suffice it to note that in 1933 the national policy was terminated through the adoption of the twenty-first amendment. Control was returned to the states which immediately set about to establish their own systems. Seventeen states adopted some form of public monopoly. See Shipman, "State Administrative Machinery For Liquor Control," 7 *Law & Contemp. Prob.* 600, 612 (1940). This had the high virtue of eliminating sales stimulations but it involved the displacement of private operation by public operation. The New Jersey Legislature chose to retain private operation while surrounding it with comprehensive safeguards designed to promote temperance and to eliminate the racketeer and bootlegger and other abusive incidents of the liquor traffic. *L.* 1933, *c.* 436; *N. J. S. A.* 33:1–1 *et seq.*; *N. J. S. A.* 33:1–3; *N. J. S. A.* 33:1–39.

New Jersey's Control Act expressly outlawed the tied house system (*N. J. S. A.* 33:1–43; *R. S.* 33:1–43.1) and broadly authorized the Commissioner to adopt regulations dealing with practices unduly designed to increase consumption and with such other matters as might become necessary in the stringent administration of the law. *N. J. S. A.* 33:1–39. In *Franklin Stores Co. v. Burnett*, 120 *N. J. L.* 596, 598 (*Sup. Ct.* 1938), this regulatory power was upheld in an opinion which reaffirmed the State's "practically limitless" power to regulate the liquor industry. See *Blanck v. Mayor and Borough Council of Magnolia*, 38 *N. J.* 484, 490–491 (1962). In *R. S.* 33:1–40 the New Jersey Legislature gave

each municipality power to limit retail licenses within its borders to one per person; in many of the other states the governing control acts themselves restricted holdings of retail licenses to one, two or three per person. See *Alaska Comp. Laws Ann.* § 04.10.250 (1962); *Colo. Rev. Stat. Ann.* §75–2–15 (1953); *Conn. Gen. Stat. Rev.* § 30–48a (*Supp.* 1963); *Kan. Gen. Stat. Ann.* § 41–311(2)(d) (1949); *Md. Ann. Code art.* 2B, § 41 (1957); *Mass. Ann. Laws ch.* 138, § 15 (1957); *Minn. Stat. Ann.* § 340.13 (*Supp.* 1963); *Mo. Ann. Stat.* § 311.260 (1963); *Neb. Rev. Stat.* § 53–124.02 (*Cum. Supp.* 1963); *N. Y. Alcoholic Beverage Control Law, McKinney's Consol. Laws, c.* 3-B, § 63(5); *Okla. Stat. Ann. tit.* 37, § 534(a) (*Supp.* 1964); *R. I. Gen. Laws Ann.* § 3–5–11 (1956); *S. C. Code* §§ 4–35, 4–36 (1962); *S. D. Code* § 5.0204(8) (1939); *Wis. Stat. Ann.* § 176.05(3) (1957). Compare *Fla. Stat. Ann.* § 561.20(5) (1962); *N. II. Rev. Stat. Ann.* § 181:22 (1964); *Pa. Stat. Ann. tit.* 47, § 4–438(b) (1952). Illustratively, New York's act provided that not more than one retail distribution license "shall be granted to any person" and Nebraska's act provided that no person shall "acquire a beneficial interest in more than a total of two alcoholic beverage retail licenses." See *New Hampshire Wholesale Beverage Assn. v. New Hampshire State Liquor Comm'n*, 100 *N. H.* 5, 116 *A.* 2d 885 (1955); *Baltimore Retail Liquor Package Stores Ass'n v. Kerngood*, 171 *Md.* 426, 189 *A.* 209, 109 *A. L. R.* 1253 (1937).

In the years following New Jersey's adoption of its Control Act there were many amendments which had a common thread. They were designed to aid in the stabilization of the industry and in the promotion of temperance through the curbing of competitive practices which tended to stimulate sales. In 1938 the Legislature authorized the Commissioner to prohibit or regulate the sale of alcoholic beverages in violation of fair trade contracts (*L.* 1938, *c.* 208; *N. J. S. A.* 33:1–23.1); the preamble to the statute noted that indiscriminate price cutting and excessive advertising of cut prices were "detrimental to the proper operation of the liquor in-

dustry and contrary to the interests of temperance." In *Gaine v. Burnett*, 122 *N. J. L.* 39 (*Sup. Ct.*), aff'd, 123 *N. J. L.* 317 (*E. & A.* 1939), the court held that even without this specific legislation the Commissioner had power to fix liquor prices and promulgate price regulations; in the course of its opinion it pointed out that the fixing of liquor prices was "an ancient method to prevent abuse in the use of a commodity of much social disadvantage." 122 *N. J. L.*, at *p.* 43. See *Butler Oak Tavern v. Division of Alcoholic Beverage Control*, 20 *N. J.* 373, 384 (1956).

In 1939 the Legislature prohibited discriminatory grants of discounts to liquor retailers and authorized the Commissioner to adopt regulations dealing with maximum discounts and related matters; the statutory preamble set forth that grants of discounts to selected retailers had contributed to destructive price wars which had unduly increased the consumption of alcoholic beverages and were "detrimental to the proper operation of the liquor industry and contrary to the interests of temperance." *L.* 1939, *c.* 87; *N. J. S. A.* 33:1–89; *Duff v. Trenton Beverage Co.*, 4 *N. J.* 595, 602–604 (1950). In 1942 the Legislature prohibited discrimination in liquor sales to wholesalers by distillers, importers and rectifiers. *L.* 1942, *c.* 264; *N. J. S. A.* 33:1–93.1. In *Canada Dry Ginger Ale, Inc. v. F & A Distrib. Co.*, 28 *N. J.* 444 (1958), the Court pointed out that this enactment served to strengthen the wholesalers' resistance if confronted with "a distiller's wish to over-stimulate sales and thus negate the public policy in favor of temperance." 28 *N. J.*, at *p.* 455.

In 1946 and 1947 the Legislature imposed mandatory limitations on retail licenses in accordance with population figures (see *L.* 1946, *c.* 147; *L.* 1947, *c.* 94; *N. J. S. A.* 33:1–12.14 *et seq.*); theretofore limitations were discretionary with the respective municipalities. *R. S.* 33:1–40; *Bumball v. Burnett, supra*, 115 *N. J. L.* 254. The statement attached to the bill which ultimately became law, set forth that experience had demonstrated that there were too many retail licenses outstanding and that an overabundance of retail licenses

results in dangerous cut-throat competition and in violations which tend to "promote intemperance, aggravate the problem of the local authorities, and develop opposition to the whole licensing system." In *Seip v. Mayor, etc., of Frenchtown,* 79 *N. J. Super.* 521 (*App. Div.* 1963), the court had occasion to point out that the various alcoholic beverage enactments must be treated together for they represent "a unified state policy." 79 *N. J. Super.*, at *p.* 523. See *Hudson Bergen County Retail Liquor Stores Ass'n v. Board of Com'rs of City of Hoboken, supra,* 135 *N. J. L.*, at *p.* 509. Viewed in the light of the statutes which preceded it, *Chapter* 152 of the *Laws of* 1962 must fairly be considered as being in furtherance of the long-standing legislative policy aimed at relationships and practices calculated to stimulate sales and impair the State's policy favoring trade stability and the promotion of temperance in the liquor field. *Cf. Allied Properties v. Department of Alco-holic Beverage Control,* 53 *Cal. 2d* 141, 346 *P. 2d* 737, 740 (1959); *Schwartz v. Kelly,* 140 *Conn.* 176, 99 *A. 2d* 89, 91, appeal dismissed, 346 *U. S.* 891, 74 *S. Ct.* 227, 98 *L. Ed.* 394 (1953).

In fixing its policy the Legislature accepted widely held views as to sound liquor control. These include beliefs that the consumption of liquor is elastic rather than inelastic, that price cuttings and their advertisement, along with comparable practices, are undesirable in the liquor field as tending to stimulate consumption, and that absentee ownership or domi-nation of retail establishments by distillers or other economic-ally powerful interests, or the concentration of retailing in the hands of an economically powerful few, would intensify the dangers of sales stimulations and other abuses and would be inimical to temperance and trade stability. The appellants have questioned some of these beliefs, particularly as to the elasticity of liquor consumption, but they have presented little supporting evidence and the trial court's finding on this score was explicitly against them. As was acknowledged by the ap-pellants' experts, chain liquor stores would economically be the most capable of local advertising and price cutting through

private brands and the most capable of growth through displacement of individual retail operators. Admittedly their mode of operation furthers absentee ownership in this highly susceptible branch of trade.

The appellants have made reference to the recent report by the New York State Moreland Commission on the Alcoholic Beverage Control Law. Although that report has raised doubts (*cf*. Levin, "Economic and Regulatory Aspects of Liquor Licensing," 112 *U. Pa. L. Rev.* 785, 799 (1964)), it has by no means disproved the traditional beliefs as to the means of effective liquor control. In the absence of more compelling data, our Legislature remains at liberty to continue the course it has set for our State, and this is particularly so because its course has thus far soundly served the public interest. Unlike New York where serious public scandal brought on the Moreland Commission with its recommendations for extensive changes in the law, our State has fared well in its administration of the highly volatile liquor field. Any suggestion that there be a change of course in favor of freer competitive practices, such as recommended by the Moreland Commission, would be entirely a matter for the New Jersey Legislature; it is worthy of note that although the New York Legislature has adopted many of the Moreland Commission's recommendations, it has not abandoned its prohibition against multiple holdings of retail licenses.

In any event, we do not sit here as a superlegislature nor do we concern ourselves with the wisdom of *Chapter* 152. Our function is to determine whether the Legislature has gone beyond the outer limits of its constitutional power. Even when dealing with an essential commodity, the Legislature is said to have broad power to adopt trade prohibitions and regulations deemed necessary for the protection of the public health, safety, morals ·or general welfare (*Hudson County News Co. v. Sills, supra,* 41 *N. J.,* at *p.* 227; *American Budget Corp. v. Furman,* 67 *N. J. Super.* 134 (*Ch. Div.*), aff'd, 36 *N. J.* 129 (1961)); and as has already been pointed out, when dealing with a nonessential and inherently dangerous

commodity such as liquor, its power is said to be almost without limit. See *Blanck v. Mayor and Borough Council of Magnolia, supra,* 38 *N. J.,* at *p.* 490; *Franklin Stores Co. v. Burnett, supra,* 120 *N. J. L.,* at *p.* 598.

The record before us does not support the allegation in the complaint that *Chapter* 152 has no observable public purpose and was enacted solely for the benefit of private interests; the fact that it was sponsored or supported by organizations, whose private interests happened to coincide with the public interests as determined by the Legislature, in nowise impaired its validity or effectiveness. See *Gundaker Central Motors, Inc. v. Gassert,* 23 *N. J.* 71, 83 (1956); *Two Guys from Harrison, Inc. v. Furman, supra,* 32 *N. J.,* at *pp.* 226–228; *Hudson County News Co. v. Sills, supra,* 41 *N. J.,* at *p.* 228; *cf. Daniel v. Family Security L. Ins. Co.,* 336 *U. S.* 220, 224, 69 *S. Ct.* 550, 93 *L. Ed.* 632, 636 (1949).

The main point relied upon by the appellants in their brief on appeal is that "the two license limitation does not bear a reasonable relationship to any public purpose and denies due process and equal protection of the law." The public purpose was to curb relationships and practices calculated to stimulate sales and impair the State's policy favoring trade stability and the promotion of temperance; and while some may consider other regulatory courses to be preferable, we cannot say that the course chosen by the Legislature and pursued in Chapter 152 is entirely without rational basis. *Cf. Reingold v. Harper, supra,* 6 *N. J.,* at *pp.* 195–197. Nor do we find any infringement of the constitutional guarantees of due process and equal protection. The appellants hold renewable annual license privileges which are not being taken away from them. Though they will have no right to acquire additional license privileges contrary to the policy embodied in *Chapter* 152, there is nothing in the constitutional clauses which guarantees any such right. The Legislature may, without at all infringing upon the due process clause, either terminate or severely regulate all liquor sales within the State. See *Ziffrin v. Reeves, supra,* 308 *U. S.,* at *p.* 138, 60 *S. Ct.,*

at *p*. 166, 84 *L. Ed.*, at *p*. 135; *Mugler v. Kansas*, 123 *U. S.* 622, 8 *S. Ct.* 273, 31 *L. Ed.* 205 (1887); *cf. Murphy v. California*, 225 *U. S.* 623, 32 *S. Ct.* 697, 56 *L. Ed.* 1229 (1911). So long as the regulations contain no irrational classifications or invidious discriminations, they will not conflict with the equal protection clause. See *Goesaert v. Cleary;* 335 *U. S.* 464, 69 *S. Ct.* 198, 93 *L. Ed.* 163 (1948); *Guill v. Mayor and Council of City of Hoboken*, 21 *N. J.* 574, 582– 583 (1956); *Eskridge v. Division of Alcoholic Beverage Control*, 30 *N. J. Super.* 472, 476–477 (*App. Div.* 1954); *cf. Hudson County News Co. v. Sills, supra*, 41 *N. J.*, at *pp*. 234– 235; *Weisberg v. Taylor*, 409 *Ill.* 384, 100 *N. E.* 2d 748, 751 (1951); *In re Kovalchuk*, 202 *Pa. Super.* 389, 195 *A.* 2d 828, 829 (*Super. Ct.* 1963). See Cooprider, "Legal Questions in the Operation of the Licensing Systems," 7 *Law & Contemp. Prob.* 621, 630–632 (1940).

▮▮ *Chapter* 152 applies equally and indiscriminately by its terms to all retail licensees similarly situated, and to the extent that it is aimed at chain liquor store operations it cannot judicially be said to be either irrational or invidious. Indeed, the rationality and validity of various legislative enactments differentiating chain store operations from individual store operations have been recognized even in cases dealing with commodities which are essential in nature and are subject to much lesser regulation than liquor. See *State Bd. of Tax Com'rs of Indiana v. Jackson*, 283 *U. S.* 527, 51 *S. Ct.* 540, 75 *L. Ed.* 1248 (1931); *Liggett Co. v. Lee*, 288 *U. S.* 517, 53 *S. Ct.* 481, 77 *L. Ed.* 929 (1933); *Great Atl. & Pac. Tea Co. v. Grosjean*, 301 *U. S.* 412, 57 *S. Ct.* 772, 81 *L. Ed.* 1193 (1937); *cf. Fox v. Standard Oil Co.*, 294 *U. S.* 87, 55 *S. Ct.* 333, 79 *L. Ed.* 780 (1935); *Lebhar, Chain Stores in America: 1859–1950* 114 *et seq.* (1952); 1 *Callman, Unfair Competition and Trade-Marks* § 10.1(c), at *p*. 153, § 21, at *p*. 437 (*2d ed.* 1950); Collins, "Anti-Chain Store Legislation," 24 *Cornell L. Q.* 198 (1939). In *Jackson* the Court pointed to the fact that the chain store has many features and advantages which "definitely distinguish it from the individ-

ual store dealing in the same commodities" (283 *U. S.*, at *p.* 535, 51 *S. Ct.*, at *p.* 542, 75 *L. Ed.*, at *p.* 1255). In *Lee* the Court noted that "the conduct of a chain of stores constitutes a form and method of merchandising quite apart from that adapted to the practice of the ordinary individually operated small store or department store" (288 *U. S.*, at *p.* 532, 53 *S. Ct.*, at *p.* 484, 77 *L. Ed.*, at *p.* 936); and in *Grosjean*, the Court, speaking through Justice Roberts, had this to say:

"If, in the interest of the people of the state, the legislature deemed it necessary either to mitigate evils of competition as between single stores and chains or to neutralize disadvantages of small chains in their competition with larger ones, or to discourage merchandising within the state by chains grown so large as to become a menace to the general welfare, it was at liberty to regulate the matter directly or to resort to the type of taxation evidenced by the Act of 1934 as a means of regulation." 301 *U. S.*, at *pp.* 426–427, 57 *S. Ct.*, at *p.* 778, 81 *L. Ed.*, at *pp.* 1201–1202.

See *Two Guys from Harrison, Inc. v. Furman, supra,* 32 *N. J.,* at 227; *cf. Great Atl. & Pac. Tea Co. v. Mayor and Commissioners of Danville,* 367 *Ill.* 310, 11 *N. E. 2d* 388, 392, 113 *A. L. R.* 1386 (1937).

That the Legislature, in furthering the needs of liquor control as it saw them, curbed one segment of the liquor trade in favor of another raises no constitutional difficulties (*Hudson County News Co. v. Sills, supra,* 41 *N. J.,* at *p.* 230; *Borden Co. v. McDowell,* 8 *Wis. 2d* 246, 99 *N. W. 2d* 146, 154 (1959));[1] indeed, most of the enactments referred to earlier in this opinion had comparable effects. Thus *L.* 1938, *c.* 208 (*N. J. S. A.* 33:1–23.1) was aimed at curbing sales by retailers below prices fixed by manufacturers in fair trade

---

[1] A trial judge's opinion in *Riley v. Liquor Control Comm'n* (*Conn. Ct. C. P.* Oct. 6, 1964), holding *Conn. Gen. Stat. Rev.* § 30–48a unconstitutional, seems to take the view that it is improper to impose restrictions "on the retail liquor trade segment" of the industry while leaving "untouched others engaged in the business of selling liquor." An appeal is now pending from the decision in *Riley* and we find no occasion for further discussion of the opinion here.

contracts; *L.* 1939, *c.* 87 (*N. J. S. A.* 33 :1–89) prohibited manufacturers and wholesalers from discriminating in their grant of discounts to retailers; and *L.* 1942, *c.* 264 (*N. J. S. A.* 33 :1–93.1) prohibited distillers, importers and rectifiers from discriminating in their sales to wholesalers. ·

■■■ The statutory provisions against the tied house system (*N. J. S. A.* 33 :1–43; *R. S.* 33 :1–43.1) were designed to prevent brewers, distillers and wholesalers from owning or controlling retailers. If the economic consideration were the dominating one, as in the testimony of Professors Markham and Baldwin, then something might be said for the position that sales by brewers, distillers and wholesalers through their own retail outlets should be permitted as conducive to reduced prices to consumers. But the dominating consideration was social rather than economic and the tied house system with its sales stimulating incidents was viewed as anti-social. The legislation against it, in our State as well as elsewhere throughout the country, has readily withstood constitutional attacks under the due process and equal protection clauses. See *Weisberg v. Taylor, supra,* 409 *Ill.* 384, 100 *N. E. 2d* 748; *Pickerill v. Schott,* 55 *So. 2d* 716 (*Fla. Sup. Ct.* 1951), *cert.* denied 344 *U. S.* 815, 73 *S. Ct.* 9, 97 *L. Ed.* 634 (1952); *Sepe v. Daneker,* 76 *R. I.* 160, 68 *A. 2d* 101 (1949); Annot: 136 *ALR* 1238 (1942).

■■■ In *Taylor,* anti-tied house legislation prohibiting the extension of credit by manufacturers and wholesalers to retailers was sustained; in the course of its opinion the court pointed out that if the legislature believes that the restrictions "will reduce the volume of sales and tend to promote temperance rather than intemperance," then it may not be said as a matter of law "that such a conclusion has no connection with the public welfare, safety or morals." 100 *N. E. 2d,* at *p.* 750. Similarly, it may not be said as a matter of law that the New Jersey Legislature's conclusion, that restricting multiple retail holdings would serve the interests and purposes of sound and effective liquor control, had no connection with the public health, safety, morals or general welfare. It may

be that the acknowledged sales stimulating abilities and tendencies of the chain liquor store operation have thus far not been as inimical as in the tied house system. But the Legislature, being aware of the threatened growth of chain liquor stores, including those associated with well-known supermarkets and discount establishments, need not wait until the evils have become flagrant and the State's liquor control policy has been impaired. See *Murphy v. California, supra,* 225 *U. S.,* at *p.* 629, 32 *S. Ct.,* at *p.* 698, 56 *L. Ed.,* at *p.* 1232; *Reingold v. Harper, supra,* 6 *N. J.,* at *p.* 196; *cf. Ferguson v. Skrupa,* 372 *U. S.* 726, 83 *S. Ct.* 1028, 10 *L. Ed.* 2d 93 (1963); *American Budget Corp. v. Furman, supra,* 67 *N. J. Super.* 134, aff'd 36 *N. J.* 129.

We come now to the attack by the appellants on *Chapter* 152 as being wholly void for vagueness and their attack on particular provisions as embodying arbitrary classifications. We are satisfied that the statute may not properly be stricken on the ground of vagueness; on the contrary, the legislative language may, within settled principles of statutory construction, readily be interpreted to effectuate the basic goal of the Legislature as it clearly appears from the history and context of the legislation. See *State v. Hudson County News Co.,* 35 *N. J.* 284, 294–298 (1961); *State v. Monleleone,* 36 *N. J.* 93, 99 (1961); *Sanitary Vendors, Inc. v. Byrne,* 40 *N. J.* 157, 162 (1963). There must be sensible rather than literal interpretation. *Lloyd v. Vermeulen,* 22 *N. J.* 200, 205 (1956); *Fidelity Union Trust Co. v. Robert,* 36 *N. J.* 561, 568 (1962). Notwithstanding its somewhat awkward terminology, section 1 is to be read as limiting the holding of retail liquor licenses to two per person, without, however, disturbing existing multiple holdings and their renewal.

The purpose underlying the legislative use of the phrase "beneficial interest," a phrase which appears throughout the law (*Montana Catholic Missions v. Missoula County,* 200 *U. S.* 118, 127–128, 26 *S. Ct.* 197, 50 *L. Ed.* 398, 402 (1906); *In re Rogers' Estate,* 15 *N. J. Super.* 189, 206 (*Essex Cty. Ct.* 1951); *In re Armistead,* 362 *Mo.* 960, 245

*S. W. 2d* 145, 148 (1952)), seems clear enough; it, along with the comparable phrase "directly or indirectly interested," was contained in the original Control Act (*L.* 1933, *c.* 436, *pp.* 1193, 1205) and was intended to include ownership interests in the broad or equitable sense rather than in the narrow or technical sense. That certain marginal situations may present close questions for determination does not indicate that the statutory language is too uncertain. *State v. Hudson County News Co., supra,* 35 *N. J.,* at *pp.* 297–298. It is worthy of note that the many references to beneficial and direct or indirect interests which appear in the regulations or application forms issued by the Division of Alcoholic Beverage Control have long been applied administratively without any significant difficulty.

There was an inadvertent omission in the penalty clause (*section* 7) but it is clear that the clause contemplated revocation of the illegally issued license as well as imposition of a fine. A bill which, *inter alia,* amends the penalty clause (*S.* 185–1964) has passed both houses of the Legislature and is awaiting action by the Governor. Without it, judicial construction may supply the omission (see *Wagner v. County Employees Pension Comm'n,* 130 *N. J. L.* 230, 234 (*E. & A.* 1943)); and the Director, acting under the Control Act itself, would undoubtedly take appropriate action as to the illegally issued license. *Cf. N. J. S. A.* 33:1–31; *R. S.* 33:1–31.1; *N. J. S. A.* 33:1–39.

The appellants contend that, the exception in *section* 2 in favor of large hotels (*cf. N. J. S. A.* 33:1–12.20), and the provision in *section* 6 enabling transfers of shares being traded on national securities exchanges or over-the-counter markets, render the statute unconstitutional; they refer to hypothetical situations which they suggest would entail consequences which are arbitrary and discriminatory. If such infirmities would actually result from the application of *sections* 2 and 6, then those sections might ultimately fall while the remaining sections of the statute are nonetheless permitted to stand (*N. J. S. A.* 1:1–10; *Ahto v. Weaver,* 39 *N. J.* 418, 427

(1963); *Angermeier v. Borough of Sea Girt*, 27 *N. J.* 298, 311 (1958); *State by McLean v. Lanza*, 27 *N. J.* 516, 527–528 (1958); *DeMonaco v. Renton*, 18 *N. J.* 352, 360 (1955)); however, we need not pursue the matter since we consider that the appellants' attack on those sections is premature and should not be dealt with academically in this proceeding. See *Proprietary Ass'n v. Board of Pharmacy of N. J.*, 16 *N. J.* 62, 72 (1954); *cf. In re Van Syckle*, 118 *N. J. L.* 578, 581 (*E. & A.* 1937); *Johnston v. Board of Adjustment, Westfield*, 118 *N. J. L.* 298, 300 (*Sup. Ct.* 1937). See also *Fidelity Union Trust Co. v. Price*, 18 *N. J. Super.* 578, 599 (*Ch. Div.*), modified 11 *N. J.* 90 (1952).

In *Proprietary Ass'n v. Board of Pharmacy of N. J.*, *supra*, this Court, in declining to grant a declaratory judgment defining the statutory phrase "patent or proprietary medicines" (*R. S.* 45:14–29), stressed the wholesome policy considerations which confine courts to actual controversies and dissuade them from rendering abstract or advisory opinions. 16 *N. J.*, at *p.* 72. There is no actual controversy before us which deals with either *section* 2 or *section* 6, and if we were now to pass on the issues raised in connection with them, we would be functioning in the abstract. In its administration of *Chapter* 152, the Division of Alcoholic Beverage Control will undoubtedly issue regulations and interpretations bearing on the hypothetical situations discussed by the appellants in the course of their argument. *Cf. Borden Company v. Thomason*, 353 *S. W. 2d* 735, 752 (*Mo. Sup. Ct.* 1962). If thereafter any of the appellants finds itself or himself aggrieved, the ensuing controversy may well be ripe for judicial examination and determination. In *Borden Co. v. McDowell*, *supra*, 8 *Wis.* 2*d* 246, 99 *N. W. 2d* 146 (1959), the Supreme Court of Wisconsin, after declaring that a statute regulating the dairy industry did not violate either the due process or equal protection clause, properly declined to deal with the interpretive matters sought to be raised by the plaintiffs-respondents; in the course of his opinion for the court, Justice Brown had this to say:

"Respondents find uncertainties in the application of the law. We do not find that there are necessarily the alleged uncertainties. That may or may not appear when attempts are made in enforcement. In the meantime we should wait until there are concrete facts rising from the application of the statute. If unconstitutional applications are attempted, the courts must deal with them at that time." 99 *N. W.* 2*d*, at *p.* 156.

The order below denying the relief sought by the plaintiffs and entering judgment for the defendants is in all respects: Affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.